**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16-259C |
| v. | ) | (Judge Sweeney) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**THE UNITED STATES' MOTION TO DISMISS**

---

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

CHARLES E. CANTER
TERRANCE A. MEBANE
SERENA M. ORLOFF
L. MISHA PREHEIM
United States Department of Justice
Civil Division, Commercial Litigation Branch

*Attorneys for the United States of America*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF THE ISSUES.......................................................................................... 2

STATEMENT OF THE CASE.............................................................................................. 2

   A.   In 2010, Congress Enacted the Risk Corridors Program as Part of the
Affordable Care Act ...................................................................................... 2

   B.   In 2014 and 2015, Congress Enacted Appropriations Laws Restricting HHS's
Ability to Make Risk Corridors Payments so as to Ensure Budget Neutrality
While Those Laws Are in Effect .................................................................. 6

   C.   To Achieve Budget Neutrality of Payments in 2015, HHS Announced a
Temporary Pro Rata Reduction of Payments, With Further Payments to Be
Made in 2016 and 2017 ............................................................................... 11

ARGUMENT ................................................................................................................ 13

   I.   The Complaint Must Be Dismissed for Lack of Subject Matter Jurisdiction ............... 13

       A.   Standard of Review............................................................................... 13

       B.   The Court Lacks Jurisdiction Under the Tucker Act Because Health
Republic Has No Substantive Right to "Presently Due Money Damages" ........... 13

          1.   The Tucker Act's Waiver of Sovereign Immunity Is Limited to
Monetary Claims that Are "Presently Due" .................................... 14

          2.   Risk Corridors Payments Are Not Presently Due .......................... 15

   II.   Health Republic's Claims Are Not Ripe ..................................................... 18

   III.   Health Republic's Claims for Non-Monetary and Special Relief Must be Dismissed .. 21

       A.   The Court Lacks Jurisdiction to Award Injunctive or Declaratory Relief............. 22

       B.   The Court Lacks Jurisdiction to Award Interest or Consequential Damages........ 23

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Annuity Transfers, Ltd. v. United States*,
  86 Fed. Cl. 173 (2009) .................................................................................13, 18, 23

*Automated Merch. Sys., Inc. v. Lee*,
  782 F.3d 1376 (Fed. Cir. 2015) .........................................................................19, 20

*Barlow & Haun, Inc. v. United States*,
  118 Fed. Cl. 597 (2014) ................................................................................18, 19, 21

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................................20

*Bianchi v. United States*,
  46 Fed. Cl. 363 (2000) .............................................................................................23

*Brown v. United States*,
  105 F.3d 621 (Fed. Cir. 1997) .................................................................................22

*Casitas Mun. Water Dist. v. United States*,
  708 F.3d 1340 (Fed. Cir. 2013) ...............................................................................18

*Clean Fuel LLC v. United States*,
  110 Fed. Cl. 415 (2013) ...........................................................................................24

*Cobell v. Norton*,
  428 F.3d 1070 (D.C. Cir. 2005) ...............................................................................17

*Contreras v. United States*,
  64 Fed. Cl. 583 (2005) .............................................................................................16

*Cty. of Suffolk, N.Y., v. United States*,
  19 Cl. Ct. 295 (1990) ...............................................................................................19

*CW Gov't Travel, Inc. v. United States*,
  46 Fed. Cl. 554 (2000) .............................................................................................19

*Dept. of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999) .................................................................................................14

*DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*,
   76 F.3d 1212 (D.C. Cir 1996) ........................................................................19

*First Hartford Corp. Pension Plan & Trust v. United States*,
   194 F.3d 1279 (Fed. Cir. 1999) .....................................................................22

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .......................................................................................20

*Friends of Potter Marsh v. Peters*,
   371 F. Supp. 2d 1115 (D. Alaska 2005) .........................................................21

*King v. Burwell*,
   135 S. Ct. 2480 (2015).....................................................................................3

*Lane v. Pena*,
   518 U.S. 187 (1996) .......................................................................................14

*LCM Energy Sols. v. United States*,
   107 Fed. Cl. 770 (2012) .................................................................................24

*Library of Congress v. Shaw*,
   478 U.S. 310 (1986).......................................................................................23

*Ex Parte McCardle*,
   74 U.S. (7 Wall.) 506 (1868) .........................................................................13

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) .......................................................................................16

*McNutt v. Gen. Motors Acceptance Corp.*,
   298 U.S. 178 (1936).......................................................................................13

*Meyers v. United States*,
   96 Fed. Cl. 34 (2010) .....................................................................................17

*Mitchell v. United States*,
   664 F.2d 265 (Ct. Cl. 1981) ...........................................................................24

*Nat'l Air Traffic Controllers Ass'n v. United States*,
   160 F.3d 714 (Fed. Cir. 1998).............................................................................23

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*,
   No. 99-11, 2000 WL 433072 (E.D. Va. Mar. 9, 2000)............................................21

*Normandy Apartments, Ltd. v. United States*,
   100 Fed. Cl. 247 (2011)....................................................................................24

*Oak Harbor Freight Lines, Inc. v. Harris*,
   No. 13-01100-HZ, 2013 WL 6576284 (D. Or. Dec. 13, 2013) ..............................21

*Overall Roofing & Const. Inc. v. United States*,
   20 Cl. Ct. 181 (1990) .......................................................................................15

*Overall Roofing & Const. Inc. v. United States*,
   929 F.2d 687 (Fed. Cir. 1991)............................................................................14

*Overton v. United States*,
   28 Fed. Cl. 812 (1993) ......................................................................................24

*Pucciariello v. United States*,
   116 Fed. Cl. 390 (2014).................................................................................22, 23

*Reynolds v. Army & Air Force Exch. Serv.*,
   846 F.2d 746 (Fed. Cir. 1988)............................................................................13

*Rothe Dev. Corp. v. Dep't of Def.*,
   413 F.3d 1327 (Fed. Cir. 2005) ..........................................................................19

*Schism v. United States*,
   316 F.3d 1259 (Fed. Cir. 2002)..........................................................................17

*Shinnecock Indian Nation v. United States*,
   782 F.3d 1345 (Fed. Cir. 2015)......................................................................19, 21

*Smith v. Sec'y of Army*,
   384 F.3d 1288 (Fed. Cir. 2004)..........................................................................15

*Smokey Bear, Inc. v. United States*,
  31 Fed. Cl. 805 (1994) ................................................................................................23

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) ...................................................................................................19

*Thorndike v. United States*,
  72 Fed. Cl. 580 (2006) ...............................................................................................23

*Todd v. United States*,
  386 F.3d 1091 (Fed. Cir. 2004) ..................................................................................14

*Ulmet v. United States*,
  19 Cl. Ct. 527 (1990) ..................................................................................................24

*United Keetoowah Band of Cherokee Indians of Okla. v. United States*,
  480 F.3d 1318 (Fed. Cir. 2007) ..................................................................................22

*United States v. King*,
  395 U.S. 1 (1969) ..................................................................................................13, 14

*United States v. Mitchell*,
  463 U.S. 206 (1983) ..............................................................................................14, 24

*United States v. Sherwood*,
  312 U.S. 584 (1941) ...................................................................................................13

*United States v. Testan*,
  424 U.S. 392 (1976) ...................................................................................................14

*W.E. Partners II, LLC v. United States*,
  119 Fed. Cl. 684 (2015) .............................................................................................17

*Westlands Water Dist. v. United States*,
  109 Fed. Cl. 177 (2013) .............................................................................................13

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ...................................................................................................19

*Widtfeldt v. United States*,
  122 Fed. Cl. 158 (2015) .............................................................................................13

*Wood v. United States*,
    214 Ct. Cl. 744 (1977) ........................................................................18

## Statutes

26 U.S.C. § 36B .............................................................................................3, 4

42 U.S.C. § 300gg ..............................................................................................3

42 U.S.C. § 1395w-115 .......................................................................................4

28 U.S.C. § 1491 .............................................................................2, 14, 22, 23

28 U.S.C. § 2516 ..............................................................................................23

26 U.S.C. § 5000A ..............................................................................................3

42 U.S.C. § 18001 ..............................................................................................6

42 U.S.C. § 18021 ..............................................................................................3

42 U.S.C. § 18031 ..............................................................................................6

42 U.S.C. § 18042 ..........................................................................................6, 24

42 U.S.C. § 18043 ..............................................................................................6

42 U.S.C. § 18054 ............................................................................................4, 5

42 U.S.C. § 18061 ............................................................................................4, 5

42 U.S.C. § 18062 ......................................................................................passim

42 U.S.C. § 18063 ............................................................................................4, 5

42 U.S.C. § 18071 ............................................................................................3, 4

42 U.S.C. § 18121 ..............................................................................................6

Pub. L. No. 102-572 ..........................................................................................14

Pub. L. No. 104–134..........................................................................................16

Pub. L. No. 111-148 ............................................................................................2

Pub. L. No. 113-235 ..........................................................................................10

Pub. L. No. 114-113 ...............................................................................................10

**Regulations**

42 C.F.R. § 423.329 ................................................................................................4

45 C.F.R. § 153 .....................................................................................................12

45 C.F.R. §§ 153.20 ...............................................................................................5

45 C.F.R. § 153.510 .......................................................................................passim

45 C.F.R. § 153.530 ...........................................................................6, 12, 15, 16

45 C.F.R. § 155.20 .................................................................................................3

**Federal Register**

76 Fed. Reg. 41,948 (July 15, 2011) ......................................................................6

77 Fed. Reg. 17,220 (March 23, 2012) ..................................................................4

78 Fed. Reg. 15, 410 (March 11, 2013) .................................................................6

79 Fed. Reg. 13,744 (March 11, 2014) ..................................................................7

79 Fed. Reg. 15,808 (March 21, 2014) ..................................................................7

79 Fed. Reg. 30,240 (May 27, 2014) .....................................................................8

80 Fed. Reg. 10,750 (February 27, 2015) ..............................................................8

**Rules of the Court of Federal Claims**

Rule 12(b)(1) .........................................................................................................13

Rule 12(h)(3) .........................................................................................................13

**Miscellaneous**

The Honorable Jeff Sessions, the Honorable Fred Upton,
    B-325630 (Comp. Gen.) 2014 WL 4825237 (Sept. 30, 2014) ...........................9, 10

Cong. Rec. Vol. 160, No. 151--Book II, H9838 (Dec. 11, 2014) ........................10, 18

Senate Report 114-74, Calendar No. 137 (June 25, 2015) ..........................................11

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant the United States, on behalf of the Department of Health & Human Services ("HHS") and HHS's Centers for Medicare & Medicaid Services ("CMS"), moves the Court to dismiss Plaintiff Health Republic Insurance Company ("Health Republic")'s Complaint for lack of subject matter jurisdiction.

## INTRODUCTION

The policy issues presented by this case are complex, but the legal principles requiring its dismissal are straightforward.

First, Health Republic has no claim to "presently due" money damages, as it must to establish jurisdiction under the Tucker Act. Section 1342 of the Affordable Care Act does not define a deadline by which risk corridors payments must be made, and HHS, in its discretion, established a three-year payment framework, consistent with the three-year length of the program established by Congress. Under this framework, HHS cannot owe Health Republic, or any other issuer, final payment before the end of the program cycle in 2017. As such, Health Republic has no substantive right to "presently due" payments that permits the Court to exercise jurisdiction over its claims.

Second, Health Republic's claims are not ripe. HHS has not finally determined the total amount of risk corridors payments issuers will receive for the program years at issue. Nor can it be known at this juncture whether Congress will appropriate funding for risk corridor payments by the time HHS's 3-year payment cycle has concluded. As Health Republic concedes, the appropriations restrictions in fiscal years 2015 and 2016 "prohibited the Government from paying risk corridors amounts" from appropriated funds other than risk corridors collections. Compl. ¶ 9. If HHS's 3-year payment cycle is permitted to run its course, as it must under

established principles of administrative law, Health Republic may receive the full amount of its claims through the administrative process.  Even if it does not, Health Republic is almost certain to receive additional payments beyond what it has received to date.  Because the final amount of payment is unknown and cannot be determined until a future time, Health Republic's claims are unripe and non-justiciable.

Third and finally, Health Republic's claims for special damages, interest, and declaratory and equitable relief must be dismissed because this Court has no jurisdiction to award such relief in this case.

## STATEMENT OF THE ISSUES

1.      Whether, as required by 28 U.S.C. § 1491, Health Republic has an entitlement to "presently due money damages" under a government program that does not require final payment before 2017.

2.      Whether Health Republic's claims for full payment are ripe for review before a final agency determination by HHS at the conclusion of the three-year program.

3.      Whether the Court has jurisdiction under the Tucker Act to award special damages, interest, declaratory relief, or equitable relief.

## STATEMENT OF THE CASE

A.      **In 2010, Congress Enacted the Risk Corridors Program as Part of the Affordable Care Act**

   1.      **The Affordable Care Act**

In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (March 23, 2010), 124 Stat. 119 (the "Act" or "ACA").   Compl. ¶ 1.  The Act is codified in various sections of Title 26 and Title 42 of the United States Code. HHS is responsible for overseeing implementation of major provisions of the Act and for

administering certain programs under the Act, either directly or in conjunction with other federal agencies. *See, e.g.*, 42 U.S.C. §§ 18041(a)(1)(A), (c)(1).[1]

The ACA adopts "three key reforms" to facilitate the purchase of health coverage in the individual market. *King v. Burwell*, 135 S. Ct. 2480, 2486 (2015). First, the Act adopts "guaranteed issue and community rating requirements," which require every issuer of coverage in the individual health insurance market to accept every qualified individual that applies for that coverage and prohibits insurers from charging higher premiums on the basis of the individual's health. *Id.* at 2482 (citing 42 U.S.C. §§ 300gg, 300gg–1(a)). Second, to avoid the possibility of adverse selection in this market, the Act "generally requires individuals to maintain health insurance coverage or make a payment to the IRS." *Id.* (citing 26 U.S.C. § 5000A). Third, "the Act seeks to make insurance more affordable" by providing refundable tax credits to certain individuals, *id.* (citing 26 U.S.C. § 36B), along with subsidies to reduce the burden of cost-sharing expenses, such as co-pays and deductibles, 42 U.S.C. § 18071.

To facilitate these reforms, the ACA establishes Health Benefit Exchanges ("Exchanges") whereby individuals can obtain health insurance coverage. 42 U.S.C. §§ 18031-18041. Each plan offered through an Exchange must be a "Qualified Health Plan" or "QHP," meaning that it provides certain "essential health benefits" and complies with other regulatory requirements. 42 U.S.C. § 18021; 45 C.F.R. § 155.20.

## 2.     The Risk Corridors Program

The implementation of the Act's reforms and the establishment of the Exchanges presented both opportunity and risk for health insurance issuers. On the one hand, issuers that

---

[1]     HHS delegated many of its responsibilities under the ACA to CMS, which created the Center for Consumer Information and Insurance Oversight ("CCIIO") to oversee implementation of the ACA. CMS and CCIIO are referred to in this motion as "HHS."

entered the Exchanges early could tap new markets of insurance consumers, such as individuals who previously had been uninsured and those eligible to purchase insurance with the assistance of federal insurance subsidies. *See* Compl. ¶¶ 2, 26, 27 (discussing new demographic of enrollees under ACA and federal subsidy programs); *see also* 42 U.S.C. §§ 18071, 18081, 18082.[2]  On the other hand, because QHPs were new insurance products sold through new market channels—and in many cases to individuals whose costs were unknown—pricing the claims costs associated with such coverage during the first few years of the Act's implementation was expected to be difficult. *See* Compl. ¶¶ 2-3, 6, 26.

To mitigate this pricing risk, the Act established three premium stabilization programs, informally known as the "3Rs." Compl. ¶ 20.  These programs took effect in 2014 and consist of reinsurance, risk adjustment, and risk corridors. *Id.*; *see also* 42 U.S.C. §§ 18061-18063.  Risk adjustment is a permanent program targeting adverse selection (*i.e.*, the risk that insurers would enroll disproportionately healthy people in order to reduce claims costs). *See* 42 U.S.C. § 18063; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. 17,220, 17,221 (Mar. 23, 2012).  Reinsurance and risk corridors are temporary programs applicable to benefit years 2014-2016 that seek to offset the effects of high and unpredicted claims costs on health insurance issuers during the first three years of the ACA's health insurance reforms. *See* 42 U.S.C. §§ 18061, 18062; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. at 17,221.  All three programs are modeled on similar programs established under the Medicare Program. *Compare* 42 U.S.C. §§ 18061-18063 *with id.* §§ 1395w-115(a)(2), (b), (c), (e); *see also id.* §§ 18062(a); 18063(b); 42 C.F.R. § 423.329(b)-(c);

---

[2]      Federal insurance subsidies are advanced directly to issuers on behalf of qualified enrollees and are only available as part of an individual QHP obtained through an Exchange. *See generally* 26 U.S.C. § 36B(c)(2)(B); 42 U.S.C. § 18071(f)(2).

*see also* Compl. ¶ 29 (noting that the risk corridors program "was modeled after a similar program enacted under President George W. Bush").[3]

The 3Rs program at issue in this case is the temporary risk corridors program established under section 1342 of the Act.  *See, e.g.*, Compl. ¶¶ 4, 7.  Section 1342 requires HHS to "establish and administer a program of risk corridors" under which insurers offering individual and small group QHPs between 2014 and 2016 "shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums." 42 U.S.C. § 18062(a).  Under the "payment methodology" set forth in the Act, if an issuer's "allowable costs" (essentially, claims costs) exceed a "target amount" (premiums minus administrative costs) by more than three percent, HHS is required to pay the issuer a percentage of the difference (referred to here as a "payment").  Compl. ¶ 21; *see also* 42 U.S.C. § 18062(b)(1).  Conversely, if an issuer's allowable costs are less than the target amount by more than three percent, the plan must pay HHS a percentage of the difference (referred to here as a "charge" or "collection").  Compl. ¶ 21; *see also* 42 U.S.C. § 18062(b)(2).  The payment and charge percentage is set by statute: either 50% or 80%, depending on the degree of loss or gain realized by the issuer.  42 U.S.C. § 18062(b).  HHS regulations incorporate this payment methodology in substantially similar terms.  *See* 45 C.F.R. § 153.510(b)-(c).[4]

---

[3]     Under the transitional reinsurance program, contributions are generally collected from health insurance issuers and self-insured group health plans for the 2014, 2015, and 2016 benefit years, and those contributions are used to fund reinsurance payments to individual-market issuers that cover high-risk (and correspondingly high-cost) individuals.  *See* 42 U.S.C. § 18061; 45 C.F.R. §§ 153.20, 153.400.  Under the permanent risk adjustment program, charges are collected from risk adjustment covered plans that enroll healthier than average enrollees and are used to make payments to qualifying issuers that enroll sicker than average enrollees.  *See* 42 U.S.C. § 18063.

[4]     The full texts of section 1342 and 45 C.F.R. § 153.510 are provided in Appendix 1.

The risk corridors program is administered as follows.  After the close of a particular benefit year (2014, 2015, or 2016), issuers must compile and submit cost data and other information underlying the risk corridors calculation to HHS no later than July 31 of the calendar year following the applicable benefit year.  45 C.F.R. § 153.530(d).  Using this data, HHS calculates the payments and charges due to and from each issuer for the preceding benefit year. *See* 45 C.F.R. § 153.530(a)-(c); HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,473-74 (March 11, 2013).  Issuers whose target amount exceeds allowable costs by more than three percent are assessed a charge.  45 C.F.R. §§ 153.510(c), (d).  Issuers whose allowable costs exceed the target amount by more than three percent are to receive a payment.  *Id.* § 153.510(b).  Neither the ACA nor the regulations specify a deadline by which CMS must make risk corridors payments.  *See generally* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.

**B.**     **In 2014 and 2015, Congress Enacted Appropriations Laws Restricting HHS's Ability to Make Risk Corridors Payments so as to Ensure Budget Neutrality While Those Laws Are in Effect**

Although Congress expressly appropriated funds within the authorizing legislation for many of the ACA's new programs and authorized funding for others,[5] Congress did not explicitly include in the ACA either an appropriation or an authorization of funding for risk corridors.  In July 2011, HHS published a proposed rule noting that when the Congressional Budget Office ("CBO") performed a cost estimate contemporaneously with the Act's passage, it "assumed [risk corridors] collections would equal payments to plans in the aggregate." Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 76 Fed. Reg. 41,930,

---

[5]     *See, e.g.*, 42 U.S.C. §§ 18001(g), 18031(a)(1), 18042(g), 18043(c), 18054(i), 18121(b).

41,948 (July 15, 2011).[6]   In March 2012, HHS published a regulatory impact analysis again noting that "CBO . . . assumed collections would equal payments to plans and would therefore be budget neutral."   Centers for Medicare & Medicaid Services, Regulatory Impact Analysis, Establishment of Exchanges and Qualified Health Plans, Exchange Standards for Employers (CMS-9989-FWP) and Standards Related to Reinsurance, Risk Corridors and Risk Adjustment (CMS-9975-F) (Mar. 16, 2012) ("March 2012 Regulatory Impact Analysis"), at 10; *see also id.* at 39 ("CBO . . . assumed aggregate collections from some issuers would offset payments made to other issuers.").[7]   *But see* Compl. ¶ 31 (alleging that in 2014, HHS "included, *for the first time*, language in the rule commentary about budget neutrality") (emphasis in original).

On March 11, 2014, HHS issued a final rule stating that "[w]e intend to implement th[e] [risk corridors] program in a budget neutral manner, and may make future adjustments, either upward or downward to this program . . .  to the extent necessary to achieve this goal."   HHS Notice of Benefit and Payment Parameters for 2015 Final Rule, 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014); *see also id.* at 13,829 ("HHS intends to implement this program in a budget neutral manner."); Exchange and Insurance Market Standards for 2015 and Beyond Proposed Rule, 79 Fed. Reg. 15,808, 15,822 (Mar. 21, 2014) (same); Compl. ¶ 31.   On April 11, 2014, HHS released guidance clarifying that it would implement budget neutrality on a three-year (*i.e.*, program-level) basis rather than on an annual or plan-year basis.   HHS explained:

[I]f risk corridors collections are insufficient to make risk corridors payments for

---

[6]      Among other functions, the CBO "provides formal written estimates of the cost of virtually every bill approved by Congressional committees to show how the bill would affect spending or revenues over the next 5 or 10 years[.]"   Congressional Budget Office, An Introduction to the Congressional Budget Office, at 1 (April 2015).

[7]      A copy of this publication and other reference material not published in the Federal Register is provided in Appendix 2.

a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall.  Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner . . . and will then be used to fund current total payments.  If, after obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall.

Centers for Medicare & Medicaid Services, Risk Corridors and Budget Neutrality, April 11, 2014, at 1.  *See also* Compl. ¶ 32.  HHS reiterated and expanded upon this guidance in final rules issued in May 2014 and February 2015.  *See* Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. 30,240, 30,260 (May 27, 2014); HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,779 (Feb. 27, 2015).

HHS did note, however, that although it would strive to achieve budget neutrality, it interpreted section 1342 to require full payments to issuers and if necessary would use sources of funding other than risk corridors collections, subject to the availability of appropriations.  *See, e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260. ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.  In [the event that risk corridors collections are insufficient to fund payments over the three-year life of the program], HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations."); HHS Notice of Benefit and Payment Parameters for 2016 Final Rule, 80 Fed. Reg. 10,750, 10779 (Feb. 27, 2015) ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In the unlikely event that risk corridors collections, including any potential carryover from the prior years, are insufficient to make risk corridors payments for the 2016 program year, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations."); HHS Notice of Benefit and Payment Parameters for 2014 Final Rule, 78

Fed. Reg. 15410, 15473 (Mar. 11, 2013) ("The risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act.").

As HHS endeavored to administer section 1342, Congress took up the question of funding for the risk corridors program.  On September 30, 2014, the Comptroller General of the United States issued an opinion to Senator Jeff Sessions and Representative Fred Upton in response to their inquiry "regarding the availability of appropriations to make [risk corridors] payments to qualified health plans pursuant to section 1342 of the [ACA]."  *See* The Honorable Jeff Sessions, the Honorable Fred Upton, B-325630 (Comp. Gen.), 2014 WL 4825237, at *1 (Sept. 30, 2014) [hereinafter "*Risk Corridors Op.*"].  Noting that the ACA "did not enact an appropriation to make [risk corridors] payments," the Comptroller General examined the annual appropriations law in effect for 2014 (the "2014 Spending Law") to determine whether it authorized funding for the program.  The opinion concluded that the 2014 Spending Law provided a lump sum amount for the CMS Program Management account to carry out responsibilities not specifically provided for elsewhere in the 2014 Spending Law, which could—in theory—be used for risk corridors payments.  *Id.* at *2-*3.  The opinion further noted, however, that because risk corridors payments would not begin until fiscal year 2015 and "[a]ppropriations acts, by their nature, are considered nonpermanent legislation," similar appropriation laws would need to be enacted in fiscal years 2015, 2016, and 2017 for the CMS Program Management account to supply a source of funding for the program.  *Id.* at *5.

Then, on December 9, 2014, before any payments could be due under the risk corridors program, Congress passed the Consolidated and Further Continuing Appropriations Act, 2015 ("the 2015 Spending Law") specifically addressing budget authority for the risk corridors

program.  Like the 2014 Spending Law, the 2015 Spending Law provided a lump sum amount

for CMS's Program Management account for fiscal year 2015.  Pub. L. No. 113-235, div. G, title

II.  Unlike the 2014 Spending Law, however, section 227 of the 2015 Spending Law included a

limitation on the availability of funds for the risk corridors program, providing that:

> None of the funds made available by this Act from [CMS trust funds], or
> transferred from other accounts funded by this Act to the 'Centers for Medicare
> and Medicaid Services—Program Management' account, may be used for
> payments under section 1342(b)(1) of Public Law 111–148 (relating to risk
> corridors).

*Id.* § 227.  The effect of the 2015 Spending Law was to limit HHS's budget authority to make

risk corridors payments to amounts derived from risk corridors collections authorized under

section 1342(b)(2).[8]  Stated otherwise, the 2015 Spending Law permits HHS to use risk corridors

collections to make risk corridors payments but prohibits it from spending other specified

appropriated funds on the program.  Compl. ¶¶ 9-10, 35.  The Explanatory Statement to the 2015

Spending Law explained that the limitation would ensure that "the risk corridor program will be

budget neutral, meaning that the federal government will never pay out more than it collects

from issuers over the three year period risk corridors are in effect."  Cong. Rec. Vol. 160, No.

151—Book II, H9838 (Dec. 11, 2014).[9]

On December 18, 2015, Congress enacted an identical funding limitation in the annual

appropriations act for fiscal year 2016 (the "2016 Spending Law").  Pub. L. No. 114-113, div. H,

title II, § 225.  *See also* Compl. ¶ 37.  The Senate Committee Report to the 2016 Spending Law

stated that the funding limitation "requir[es] the administration to operate the Risk Corridor

---

[8]     Collections under the risk corridors program qualify as "user fees" and thus are
authorized for retention and expenditure by CMS under the Program Management appropriation
and applicable appropriations law.  *See Risk Corridors Op.*, 2014 WL 4825237, at *3-5.

[9]     The Explanatory Statement is intended to be given interpretive effect "as if it were a joint
explanatory statement of a committee of conference."  Pub. L. No. 113-235 § 4.

program in a budget neutral manner by prohibiting any funds from the Labor-CMS-Education appropriations bill to be used as payments for the Risk Corridor program."   Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Bill, 2016, Senate Report 114-74, Calendar No. 137 (June 25, 2015), at 12.   As Health Republic acknowledges, "[t]he practical effect of the [Spending Laws] was to prevent CMS and HHS from paying QHPs their full risk corridor receivable[.]"  Compl. ¶ 10.

**C.     To Achieve Budget Neutrality of Payments in 2015, HHS Announced a Temporary Pro Rata Reduction of Payments, With Further Payments to Be Made in 2016 and 2017**

On July 31, 2015, issuers submitted their risk corridors data for the 2014 benefit year pursuant to the schedule established by HHS.  *See* Centers for Medicare & Medicaid Services, Key Dates in 2015: QHP Certification in the Federally-Facilitated Marketplaces; Rate Review; Risk Adjustment, Reinsurance, and Risk Corridors (Apr. 14, 2015), at 2.  On October 1, 2015, HHS announced that payment requests under the program totaled $2.87 billion whereas collections were expected to total only $362 million.   HHS explained that, because payment requests exceeded collections, it could pay only 12.6% of the 2014 risk corridors payment requests in the 2015 payment cycle.   Compl. ¶ 41; *see also id.* ¶ 45 (noting that the 2015 and 2016 Spending Laws "forced the Government to pay only 12.6% of the 2014 risk corridor amounts owed to all QHPs").   Shortly thereafter, CMS released an individualized report of risk corridors payments and charges for each issuer for the 2014 benefit year.  *See generally* Centers for Medicare & Medicaid Services, Risk Corridors Payment and Charge Amounts for 2014 Benefit Year (Nov. 19, 2015) ("2014 Payment and Charge Report").  The 2014 Payment and Charge Report listed issuers' aggregate payment and charge amounts for benefit year 2014 as well as the pro-rated amounts to be disbursed in 2015.  *See id.*  The same day, HHS released a

guidance document explaining that it would make the 12.6% payments in late 2015, with "[t]he remaining 2014 risk corridors payments . . . made from 2015 risk corridors collections [in fiscal year 2016], and if necessary, 2016 collections [in fiscal year 2017]."  Centers for Medicare & Medicaid Services, Risk Corridors Payments for the 2014 Benefit Year (November 19, 2015) ("November 19 Guidance Document").  The November 19 Guidance Document also advised that, "[i]n the event of a shortfall for the 2016 program year, [HHS] will explore other sources of funding for risk corridors payments, subject to the availability of appropriations.  This includes working with Congress on the necessary funding for outstanding risk corridors payments."  *Id.*

In November 2015, HHS began collecting risk corridors charges for the 2014 benefit year.  *See* 2014 Payment and Charge Report, at 1.  In December 2015, HHS began remitting 12.6% of risk corridors payments to issuers, including Health Republic.  *Id.*  As noted in the November 19 Guidance Document, HHS expects to pay additional installments of these payments in 2016 and, if necessary, in 2017, until issuers have been paid in full.  With respect to risk corridors payments for benefit year 2015, those amounts have not yet been determined and will not be calculated until after issuers submit their risk corridors data in July 2016.  *See* 45 C.F.R. § 153.530(d); *see also* Compl. ¶¶ 16, 50.

On February 24, 2016, Health Republic filed this putative class action "seek[ing] the immediate payment in full of risk corridors receivables for 2014 and immediate payment of risk corridor receivables for 2015, once they are determined."  Compl. ¶ 50.  Health Republic seeks "monetary relief in the amounts to which Plaintiff and the [putative] Class are entitled under Section 1342 of the [ACA] and 45 C.F.R. § 153,510(b)," as well as consequential damages, injunctive relief, declaratory relief, interest, and litigation costs.  Compl. at Prayer for Relief.

**ARGUMENT**

I. **The Complaint Must Be Dismissed for Lack of Subject Matter Jurisdiction**

A. **Standard of Review**

A motion to dismiss for lack of subject matter jurisdiction is governed by RCFC 12(b)(1). When considering such a motion, the court accepts as true all undisputed factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 190 (2013). However, when the movant challenges the jurisdictional facts alleged in the complaint, "[t]he plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction." *Widtfeldt v. United States*, 122 Fed. Cl. 158, 162 (2015). The burden of proving that the court possesses subject matter jurisdiction lies at all times with the plaintiff. *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 173, 176-77 (2009) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). If the court determines that the plaintiff has not met its burden, the court "cannot proceed at all in any cause" and must dismiss the action. *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); RCFC 12(h)(3).

B. **The Court Lacks Jurisdiction Under the Tucker Act Because Health Republic Has No Substantive Right to "Presently Due Money Damages"**

"The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of sovereign immunity is a necessary prerequisite to the exercise of jurisdiction over the United States by any court. *See, e.g.*, *United States v. King*, 395 U.S. 1, 4 (1969). Such a waiver "must be unequivocally expressed in the statutory text" and "strictly construed, in terms of its scope," in favor of the

United States.  *Lane v. Pena*, 518 U.S. 187, 192 (1996).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit," without regard to any perceived unfairness, inefficiency, or inequity.  *Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999).

### 1.   The Tucker Act's Waiver of Sovereign Immunity Is Limited to Monetary Claims that Are "Presently Due"

The Tucker Act, under which Health Republic asserts jurisdiction, Compl. ¶ 14, waives sovereign immunity for certain non-tort claims against the United States founded upon the Constitution, a federal statute or regulation, or a contract.  28 U.S.C. § 1491(a)(1).  The Tucker Act "does not create any substantive right enforceable against the United States for money damages."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  "Thus, jurisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."  *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (citing *Testan*, 424 U.S. at 398).  In meeting this burden, it is not enough for a plaintiff to point to a law requiring the payment of money in the abstract.  Instead, the law must "fairly be interpreted as mandating compensation for damages sustained as a result of *a breach of . . . duties [it] impose[s]*."  *United States v. Mitchell*, 463 U.S. 206, 219 (1983) (emphasis added).

Further, the law must entitle the plaintiff to "'actual, *presently due* money damages from the United States.'"  *Todd*, 386 F.3d at 1093-94  (citing *King*, 395 U.S. at 3); *see also Overall Roofing & Const. Inc. v. United States*, 929 F.2d 687, 689 (Fed. Cir. 1991) ("[T]he word 'claim' carries with it the historical limitation that it must assert a right to presently due money."), *superseded by statute on other grounds*, Pub. L. No. 102-572, Title IX, §§ 902(a), 907(b)(1), 106 Stat. 4506, 4516, 4519 (1992).  Thus, that a particular statute requires monetary payments under

certain circumstances is insufficient to confer Tucker Act jurisdiction, if that law does not also provide a presently due monetary remedy "under the circumstances of th[e] case." *Smith v. Sec'y of Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004); *Overall Roofing & Const. Inc. v. United States*, 20 Cl. Ct. 181, 184 (1990) ("Claims which are merely 'money-oriented' or 'money cast' are not sufficient; this court's jurisdiction extends only 'to actual, presently due money damages from the United States.'").

### 2.     Risk Corridors Payments Are Not Presently Due

With respect to risk corridors payments for benefit year 2015, it is undisputed that HHS will not begin to calculate these amounts—much less make payments—until after July 31, 2016, the deadline established by regulation for issuers to submit data. *See* 45 C.F.R. § 153.530(d) ("For each benefit year, a QHP issuer must submit all [risk corridors data] . . . by July 31 of the year following the benefit year."); Compl. ¶ 16 ("The precise 2015 risk corridor receivable will be determined after the submission of final data to CMS later in 2016."). Health Republic clearly has no right to "actual, presently due money damages" for payments that, by regulation, cannot yet be calculated.

As for amounts due for benefit year 2014, Health Republic's claim of Tucker Act jurisdiction rests on its mistaken assertion that section 1342 and its implementing regulation, 45 C.F.R. § 153.510, require HHS to fully pay risk corridors on an "annual cycle." *See* Compl. ¶¶ 14 & 15 (suggesting jurisdiction exists because HHS "will not pay Plaintiff and the Class the full amounts they are owed for 2014 and 2015 *within the annual cycle required by Section 1342 and Section 153.510*.") (emphasis added). But section 1342 and section 153.510 merely establish the risk corridors program and the methodology for calculating payments and charges; they do not require HHS to pay risk corridors on an "annual cycle," nor do they impose any other

temporal constraints on when HHS must pay risk corridors.  *See generally* 42 U.S.C. § 18062; 45

C.F.R. § 153.510.  Section 1342 requires CMS to calculate risk corridors payments and charges

based on claims and other costs for a "benefit year," but it does not require CMS to pay risk

corridors on an annual basis.  Likewise, while section 153.510(d) requires issuers to pay charges

within 30 days of notification by CMS, it does not establish any deadline by which HHS must

make payments to issuers.  *See* 45 C.F.R. § 153.510(d).

In the absence of a contrary statutory provision, "agencies, not the courts, . . . have

primary responsibility for the programs that Congress has charged them to administer."

*McCarthy v. Madigan*, 503 U.S. 140, 145 (1992), *superseded by statute on other grounds*, Pub.

L. No. 104–134, § 803, 110 Stat. 1321 (Apr. 26, 1996).  By declining to specify when payments

from HHS were due and delegating to HHS the responsibility to "establish and administer" the

risk corridors program, 42 U.S.C. § 18062(a), Congress conferred "broad discretion" to HHS "to

tailor [the] . . . program to fit both its needs and its budget."  *Contreras v. United States*, 64 Fed.

Cl. 583, 599 (2005), *aff'd*, 168 F. App'x 938 (Fed. Cir. 2006).

HHS exercised this discretion by establishing a three-year payment framework.  Under

this framework, if risk corridors claims exceed collections for a given benefit year, as they did in

fiscal year 2015 (for benefit year 2014), payments are temporarily reduced so as not to exceed

HHS's budget authority for that year; however, further payments for that benefit year are made

in subsequent payment cycles, with final payment not due until the final payment cycle in 2017.

*See* Compl. ¶¶ 17, 32, 33 (acknowledging HHS's multi-year payment cycle); Centers for

Medicare & Medicaid Services, *Risk Corridors and Budget Neutrality*, at 1; November 19

Guidance Document.  Thus, HHS's three-year payment framework is well within the

administrative authority delegated by Congress, and it is entitled to deference by the Court.  *See,*

*e.g.*, *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 692 (2015) (deferring to agency framework for payments under statutory program because the "discretion afforded to the Treasury Department suggest Congress's intent to defer to the agency with the administration of this law"), *aff'd*, 636 Fed. Appx. 796 (Fed. Cir. 2016); *Meyers v. United States*, 96 Fed. Cl. 34, 54-55 (2010) (deferring to agency where statute authorized it to "establish" regulatory program and did "not [expressly] proscribe" the programmatic framework established).

Subsequent laws concerning the administration of section 1342 confirm that HHS has discretion to administer the risk-corridors program by using a three-year payment framework.  As noted above, the Spending Laws enacted in 2014 and 2015 precluded HHS from using specified appropriated funds, other than risk corridors collections, to make risk corridors payments in 2015 and 2016.   The three-year framework permits HHS to pay out the maximum amount possible on claims for each program year and also adheres to the express statutory prohibition on the use of specified program funds for risk corridor payments in 2015 and 2016.  Indeed, HHS could not adhere to the restrictions in the 2015 and 2016 Spending Laws without also adhering to its three-year payment framework and implementing the risk corridors program in a budget neutral manner during the years the Spending Laws are in effect, because the Spending Laws left HHS with no discretion to make payments in 2015 and 2016 for amounts that exceed collections in those years.  *Cf. Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) (noting that appropriations limits "unequivocally control what may be spent on [covered] activities during the period of their applicability," and relying in part on Congress's post-1994 appropriations limitations to conclude that the underlying 1994 statute did not require a cost-unlimited accounting); *Schism v. United States*, 316 F.3d 1259, 1290 (Fed. Cir. 2002) (noting that Congress ratifies agency action when an "appropriation act . . . show[s] a purpose to bestow

the precise authority" at issue).  In the Explanatory Statement to the 2015 Spending Law, Congress indicated that the funding limitation would ensure that "the risk corridor program will be budget neutral . . . *over the three year period risk corridors are in effect*."  Cong. Rec. Vol. 160, No. 151—Book II, H9838 (Dec. 11, 2014) (emphasis added).

Because HHS's payment framework has not yet run its course, Health Republic does not seek "presently due money damages" in compensation for any discernable legal violation, but instead seeks relief to which it has no substantive right: immediate payment.  The Tucker Act does not confer jurisdiction under such circumstances.  *See, e.g.*, *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1358 (Fed. Cir. 2013) (observing that "a compensable injury [under the Tucker Act] could not have occurred because [a legal violation] has not yet occurred"); *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 173, 179 (2009) (holding that a plaintiff's mere "desire to receive a lump sum payment in lieu of" installment payments does not establish a legal violation by the United States or give rise to presently due money damages); *Wood v. United States*, 214 Ct. Cl. 744, 745 (1977) ("At best, plaintiff is claiming that he is not going to get [when the time comes] what is due him; such a claim is for future relief which we may not now entertain.") (citations omitted); *cf. Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 622 (2014) (dismissing claim where agency "had not actually failed to perform a presently due . . . obligation prior to plaintiffs filing suit"), *aff'd*, 805 F.3d 1049 (Fed. Cir. 2015). Health Republic's complaint should be dismissed for lack of jurisdiction.

## II.      Health Republic's Claims Are Not Ripe

Health Republic's claims also should be dismissed because they are not ripe.  "Ripeness is a justiciability doctrine that prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Shinnecock Indian Nation v. United*

*States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations and internal punctuation omitted); *see also Barlow & Haun, Inc.*, 118 Fed. Cl. at 614-15 ("[T]he court may find that it possesses jurisdiction over the subject matter of a claim but that the dispute is nevertheless nonjusticiable.").[10]  Because "[t]he role of the federal courts is to provide redress for injuries that are 'concrete in both a qualitative and temporal sense,' . . . . '[a]dherence to ripeness standards prevents courts from making determinations on the merits of a case before all the essential facts are in.'"  *Shinnecock Indian Nation*, 782 F.3d at 1351-52 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  "[A] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all' . . . [or] 'if further factual development is required.'"  *Id.* at 1349 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985); *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1335 (Fed. Cir. 2005)).

Central to the ripeness doctrine is the principle that agency action must "be 'final' prior to court review to avoid judicial intervention in disputes that may still be resolved by the agency itself."  *Cty. of Suffolk, N.Y., v. United States*, 19 Cl. Ct. 295, 299 n.2 (1990) (citations omitted).  The final-agency-action requirement serves several functions.  "It allows the agency an opportunity to apply its expertise and correct its mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in piecemeal review which is at the least inefficient and upon completion of the agency process might prove to have been unnecessary."  *Automated Merch. Sys., Inc. v. Lee*, 782 F.3d 1376, 1381 (Fed. Cir.) (citing *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir 1996)), *cert.*

---

[10]     Although the constitutional basis for the justiciability doctrine derives from the "cases or controversies" requirement in Article III of the Constitution, the Court of Federal Claims applies the doctrine on prudential grounds.  *See, e.g.*, *CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557-58 (2000) (citing cases).

*denied*, 136 S. Ct. 419 (2015). Generally, two requirements must be met for an agency action to be final. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 1380 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

Health Republic's claims are not ripe because HHS has not "consummat[ed] [its] decisionmaking process" regarding the total amount of payments Health Republic (or any other issuer) will receive under the program. *Automated Merch. Sys.*, 782 F.3d at 1380. HHS has not begun its data analysis for benefit year 2015, and benefit year 2016 is still underway. Whether sufficient funds will be available to make full payment of claims for any particular benefit year, and for all three years combined, is unknown. HHS may collect sufficient funds in future years to pay risk corridors claims in full. Alternatively, Congress might appropriate funds for the program in fiscal year 2017 to pay all risk corridors amounts, thereby resolving the issue. Even if neither scenario materializes and risk corridors payment requests exceed collections across all three program years, Health Republic may nevertheless collect in full because it withdrew from the 2016 market. Compl. ¶ 45. Its claims, therefore, are limited to benefit years 2014 and 2015, and those years receive priority under HHS's methodology. *See* Compl. ¶ 17 ("Pursuant to CMS rules, 2014 unpaid risk corridor amounts must be paid before 2015 risk corridor payments can be made."). In short, it is too soon to determine whether Health Republic will receive less than the full amount of its risk corridors claims, much less the extent of any such underpayment.

In the absence of a final risk corridors payment by HHS, Health Republic premises its claims entirely on its speculation that "risk corridor payments to the Government [for benefit year 2015] will be insufficient to satisfy the Government's full obligations."  Compl. ¶ 49.  This is precisely the type of "contingent future event" that does not give rise to a justiciable case or controversy.  *Shinnecock Indian Nation*, 782 F.3d at 1349; *accord Barlow & Haun, Inc.*, 118 Fed. Cl. at 615; *see also Oak Harbor Freight Lines, Inc. v. Harris*, No. 13-01100-HZ, 2013 WL 6576284, at *9 (D. Or. Dec. 13, 2013) (mere "speculation" regarding future events did not "constitute final agency actions" that could support jurisdiction); *Friends of Potter Marsh v. Peters*, 371 F. Supp. 2d 1115, 1125 (D. Alaska 2005) (holding that "judicial review will be more honed when there is a specific final [decision] in place, instead of mere speculation concerning what the final agency action will be"); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, No. 99-11, 2000 WL 433072, at *5 (E.D. Va. Mar. 9, 2000) ("[N]either the plaintiffs' speculation . . . nor their fear [regarding a possible future agency action] satisfy the *Bennett* requirement for a direct legal consequence of a final agency action.").

Simply put, the resources of this Court are not available to address hypothetical situations that may be fully addressed by agency action, legislative action, and/or the passage of time.  *See, e.g., Shinnecock Indian Nation*, 782 F.3d at 1351-52 (affirming dismissal for lack of ripeness where "multiple possible . . . outcomes and factual developments could impact the Court of Federal Claims' adjudication" of plaintiff's claims).  The case is not ripe and should be dismissed.

## III.     Health Republic's Claims for Non-Monetary and Special Relief Must be Dismissed

Finally, Health Republic asks the Court to award a variety of non-monetary and special relief, including "consequential damages, special damages, or other damages that result as a

consequence of the Defendant's non-performance"; "appropriate injunctive relief, including but not limited to an injunction requiring Defendant to pay all amounts for 2014 and 2015"; "pre-judgment and post-judgment interest at the maximum rate permitted under the law"; and "appropriate declaratory relief, including but not limited to a declaration and judgment that Defendant's conduct alleged in the complaint violates the laws alleged in the complaint." Compl. at Prayer for Relief ¶¶ C-F.  These claims should be dismissed for the additional reason that the Court lacks jurisdiction to award such relief.

### A.      The Court Lacks Jurisdiction to Award Injunctive or Declaratory Relief

It is well-established that "[t]he Court of Federal Claims may award equitable relief in only very limited, statutorily defined, circumstances."  *Pucciariello v. United States*, 116 Fed. Cl. 390, 411-12 (2014) (citing *United Keetoowah Band of Cherokee Indians of Okla. v. United States*, 480 F.3d 1318, 1326 n.5 (Fed. Cir. 2007)); *see also First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1294 (Fed. Cir. 1999) ("The Court of Federal Claims, except for certain narrowly defined circumstances, is prohibited from granting equitable relief." (citation omitted)); *Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997) ("The Tucker Act does not provide independent jurisdiction over . . . claims for [declaratory or injunctive] equitable relief.").  The Court's jurisdiction to grant equitable or declaratory relief is limited to cases in which such remedies are "incident and collateral to" and necessary "to complete the relief afforded by" a monetary or procurement judgment within the Court's primary jurisdiction. 28 U.S.C. § 1491(a)(2), (b)(2).

First, for the reasons set forth above, the Court lacks jurisdiction over Health Republic's monetary claims and such claims are currently non-justiciable.  Therefore the Court "has no basis upon which to exercise jurisdiction over [the] claims for injunctive or declaratory relief."

*Pucciariello*, 116 Fed. Cl. at 411-12 (citations omitted); *see also Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) ("there is no provision giving the Court of Federal Claims jurisdiction to grant equitable relief . . . unrelated to a claim for monetary relief pending before the court"); *Thorndike v. United States*, 72 Fed. Cl. 580, 582 (2006).

Second, even if Health Republic adequately stated a claim for presently due money damages (it has not), the Court's authority to issue equitable or declaratory relief in such cases is limited to three statutorily defined circumstances:  (i) "orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records" where "incident and collateral to" a money judgment, 28 U.S.C. § 1491(a)(2); (ii) actions brought under the Contract Disputes Act of 1979, *id.*; and (iii) bid protests, *id.* § 1491(b)(2); *see, e.g.*, *Annuity Transfers, Ltd.*, 86 Fed. Cl. at 181-82.  None of these circumstances apply here.

Third, even if the Court could otherwise grant injunctive or declaratory relief, granting such relief in this case would amount to no relief at all because it is undisputed that HHS currently lacks appropriated funds from which to make the payments Health Republic seeks and therefore would be unable to make the payments even if ordered to by the Court.  The claims for declaratory and injunctive relief should be dismissed.

### B.        The Court Lacks Jurisdiction to Award Interest or Consequential Damages

Congress has expressly provided that "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress *expressly providing for payment thereof*."  28 U.S.C. § 2516(e) (emphasis added); *see also Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986); *Bianchi v. United States*, 46 Fed. Cl. 363, 365 (2000); *Smokey Bear, Inc. v. United States*, 31 Fed. Cl. 805, 807

(1994) ("[T]he United States' sovereign immunity has not been waived with respect to interest, because there has been no affirmative and separately contemplated [waiver] by Congress").

As discussed, Health Republic grounds its claims on section 1342 of the ACA, 42 U.S.C. § 18042, and its implementing regulation, 45 C.F.R. § 153.510, neither of which provide for the payment of interest on risk corridors payments.  Nor has Health Republic identified any other factual or legal basis on which it may collect interest from the United States.  "In other words, the plaintiff has demonstrated no waiver of sovereign immunity . . . and thus no basis for an interest claim in this Court."  *Overton v. United States*, 28 Fed. Cl. 812, 816-17 (1993) (citing *Ulmet v. United States*, 19 Cl. Ct. 527, 532 (1990)); *see also Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247, 258 n.16 (2011) ("this court lacks jurisdiction over plaintiff's claim for 'interest' as there is no statute authorizing the payment of prejudgment interest here.").

For the same reason, the Court also lacks jurisdiction over Health Republic's claims for "consequential" or "special" damages.  The Court of Federal Claims "has no jurisdiction over a claim for one type of money damages if the 'money-mandating' statute the plaintiff cites pertains only to a *different* type of money damages."  *Clean Fuel LLC v. United States*, 110 Fed. Cl. 415, 418 (2013) (emphasis in original) (citing *Mitchell v. United States*, 664 F.2d 265, 270 (Ct. Cl. 1981) (en banc), *aff'd,* 463 U.S. 206 (1983)).  Just as sections 1342 and 153.510 do not authorize interest, "there is no provision, explicit or implicit, for any kind of consequential damages" and thus cannot fairly be interpreted as authorizing the award of such damages.  *Id.* at 419; *see generally* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.  The authority to award "such damages [is] simply not within" the Tucker Act's limited waiver of sovereign immunity or this Court's jurisdiction.  *Id.* at 420; *see also LCM Energy Sols. v. United States*, 107 Fed. Cl. 770, 774 (2012) ("Plaintiff's novel theory regarding the availability of consequential damages has no basis

in either statute or case law."). The claim for consequential and special damages should be dismissed.

## CONCLUSION

For these reasons, the United States respectfully requests that the motion to dismiss be granted and Health Republic's complaint be dismissed for lack of subject matter jurisdiction or, alternatively, for lack of a justiciable claim.

Respectfully submitted,

Dated: June 24, 2016

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

*/s/ Charles E. Canter*
CHARLES E. CANTER
TERRANCE A. MEBANE
SERENA M. ORLOFF
L. MISHA PREHEIM
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
Phone: (202) 616-2236
Fax: (202) 307-0494
Charles.Canter@usdoj.gov

*Attorneys for the United States of America*

## **CERTIFICATE OF SERVICE**

I certify that on June 24, 2016, a copy of the attached Motion to Dismiss was served  via the Court's CM/ECF system on Plaintiff's counsel, Stephen Andrew Swedlow.

*/s/ Charles E. Canter*

Charles E. Canter
U.S. Department of Justice