**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY,<br><br>    Plaintiff,<br>    on behalf of itself and all others<br>    similarly situated,<br><br>        vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendant. | No.  1:16-cv-00259-MMS<br><br>(Judge Sweeney) |

**PLAINTIFF HEALTH REPUBLIC INSURANCE COMPANY'S**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................6

STATEMENT OF THE ISSUES.............................................................................6

STATEMENT OF THE CASE.................................................................................6

I.    THE AFFORDABLE CARE ACT'S 3R PROGRAMS WERE DESIGNED TO
REDUCE UNCERTAINTY FOR INSURERS AND TO STABILIZE
PREMIUMS.....................................................................................................6

    A.    The ACA Created the 3Rs to Work Together to Stabilize and Mitigate
Risk ......................................................................................................7

II.    THE ACA RISK CORRIDORS PROGRAM HAS COMMON
REQUIREMENTS AND THE GOVERNMENT'S FAILURE TO PAY HAS
HAD COMMON EFFECTS.............................................................................8

    A.    Mechanics of the ACA Risk Corridors Program ....................................8

    B.    The Government's Failure to Make Timely Full Payments Has Had
Classwide Effects................................................................................10

ARGUMENT .........................................................................................................11

I.    THE CLASS SHOULD BE CERTIFIED........................................................11

    A.    The Requirements of Rule 23(a) and (b) Are Readily Satisfied ............13

        1.    Numerosity...................................................................................13

        2.    Commonality................................................................................16

            (a)    Common Issues................................................................16

            (b)    Similar Treatment ............................................................18

            (c)    Predominance...................................................................18

        3.    Typicality....................................................................................20

        4.    Adequacy ....................................................................................21

            (a)    Adequacy of Representation.............................................21

            (b)    Lack of Conflict ..............................................................22

5.      Superiority.................................................................................................22

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

### Cases

*Adams v. United States,*
  93 Fed. Cl. 563 (2010) ...................................................................................12, 15, 16, 19

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997).........................................................................................................13

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,*
  133 S. Ct. 1184 (2013)........................................................................................................7

*Barnes v. United States,*
  68 Fed. Cl. 492 (2005) ...............................................................................................8, 13, 14

*Blue Cross & Blue Shield of North Carolina v. United States,*
  No. 1:16-cv-651 (Fed. Cl.)...............................................................................................18

*Brady v. Thurston Motor Lines,*
  726 F.2d 136 (4th Cir. 1984) ..............................................................................................9

*Bright v. United States,*
  603 F.3d 1273 (Fed. Cir. 2010)....................................................................................10, 18

*Brown v. United States,*
  126 Fed. Cl. 571 (2016) .............................................................................................8, 10, 11

*In re Cincinnati Radiation Litig.,*
  187 F.R.D. 549 (S.D. Ohio 1999 .........................................................................................9

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013).....................................................................................................14

*Curry v. United States,*
  81 Fed. Cl. 328 (2008) ......................................................................................................14

*DeMons v. United States,*
  119 Fed. Cl. 345 (2014) ...............................................................................................10, 19

*Douglas R. Bigelow Trust v. United States,*
  97 Fed. Cl. 674 (2011) .............................................................................7, 9, 12, 15, 19

*Evergreen Health Cooperative Inc. v. U.S. Dep't of Health & Human Servs.,*
  No. 1:16-cv-2039 (D. Md.) ...............................................................................................18

*Fauvergue v. United States,*
  86 Fed. Cl. 82 (2009), *rev'd on other grounds sub nom. Bright v. United States,*
  603 F.3d 1273 (Fed. Cir. 2010)..........................................................................................18

*First Priority Life Ins. Co. v. United States,*
    No. 1:16-cv-587 (Fed. Cl.) ................................................................................18

*Fisher v. United States,*
    69 Fed. Cl. 193 (2006) ......................................................................................15

*Geneva Rock Prods., Inc. v. United States,*
    100 Fed. Cl. 778 (2011) ...........................................7, 8, 9, 11, 12, 15, 17, 18

*Gross v. United States,*
    106 Fed. Cl. 369 (2012) ........................................................................12, 17, 19

*Haggart v. United States,*
    89 Fed. Cl. 523 (2009) ...............................................................................8, 13, 17

*Haggart v. United States,*
    104 Fed. Cl. 484 (2012) ...................................................................................9, 10

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008)................................................................................6

*Jones v. United States,*
    118 Fed. Cl. 728 (2014) .....................................................................................8

*King v. United States,*
    84 Fed. Cl. 120 (2008) ...........................................................................8, 9, 11, 18

*Land of Lincoln Mutual Health Ins. Co. v. United States,*
    No. 1:16-cv-744 (Fed. Cl.)................................................................................18

*Maine Community Health Options v. United States,*
    No. 16-cv-967 (Fed. Cl.)...................................................................................18

*Markham v. White,*
    171 F.R.D. 217 (N.D. Ill. 1997).......................................................................10

*Moda Health Plan, Inc. v. United States,*
    No. 1:16-cv-649 (Fed. Cl.)...............................................................................18

*Moore v. PaineWebber, Inc.,*
    306 F.3d 1247 (2d Cir. 2002)............................................................................13

*New Mexico Health Connections v. United States,*
    No. 1:16-cv-1199 (Fed. Cl.).............................................................................18

*Sagers v. Yellow Freight Sys., Inc.,*
    529 F.2d 721 (5th Cir. 1976) .............................................................................9

*Sears v. United States,*
    124 Fed. Cl. 444 (2015) .....................................................................................9

*Singleton v. United States,*
    92 Fed. Cl. 78 (2010) ..........................................1, 7, 8, 9, 10, 11, 12, 15, 17, 19

*Toscano v. United States*,
  98 Fed. Cl. 152 (2011) ...................................................................................7

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ............................................................................13, 14

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................6, 11, 12, 19

## Statutes

28 U.S.C. 1332(d)(5)(B) ....................................................................................9

45 C.F.R. § 153.510 ......................................................................................5, 12

45 C.F.R. §153.530(b) .......................................................................................4

45 C.F.R. § 153.530(d) .......................................................................................5

42 U.S.C. § 18062(b) ..........................................................................................4

42 U.S.C. § 18062(c)(1)(A) ................................................................................4

42 U.S.C. § 18062(c)(1)(B) ................................................................................4

42 U.S.C. § 18062(c)(2) ......................................................................................4

RCFC 23(a)(3) ............................................................................................17, 18

RCFC 23(3)(A) ..................................................................................................17

RCFC 23(3)(B) ..................................................................................................17

RCFC 23(3)(D) ...........................................................................................17, 18

RCFC 23(c)(2)(B)(v) .........................................................................................18

RCFC 23(g)(1)(A) ..............................................................................................16

RCFC 23(g)(4) ...................................................................................................16

## Other Authorities

Newberg on Class Actions § 3.29 (5th ed.) .........................................................15

## PRELIMINARY STATEMENT

This case, which concerns the Government's failure to make full timely payments to health insurers that provided qualified health plans ("QHPs") on healthcare exchanges pursuant to the risk-corridors provision of the Affordable Care Act ("ACA"), is tailor-made for class certification.  Each of the QHP-issuer Class members was subject to the same requirements under the same statute and regulations and has been harmed in the same way by the same Government action.  Each member of the Class will look to the same evidence to prove liability and damages.  In other words, each Class member was subject to the same rules and was affected in the same way by the same Government decisions.

Because the requirements for certification under Rule 23 of the United States Court of Federal Claims ("RCFC") are readily satisfied and certification of the Class "serves public purposes of judicial economy and efficiency," *Singleton v. United States*, 92 Fed. Cl. 78, 82 (2010), the Class should be certified.  Plaintiffs therefore seek approval of the following class:

> All persons or entities offering Qualified Health Plans under the Patient Protection and Affordable Care Act in 2014 and 2015, and whose allowable costs were more than 103 percent of their target amounts (as those terms are defined in the Patient Protection and Affordable Care Act). Excluded from the Class is the Defendant and its members, agencies, divisions, departments, and employees.

## STATEMENT OF THE ISSUES

1.      Whether the Court should certify the Class pursuant to RCFC 23 where each Class member was subject to the same statute and regulations and was affected in the same way by the same Government actions.

## STATEMENT OF THE CASE

### I.      THE AFFORDABLE CARE ACT'S 3R PROGRAMS WERE DESIGNED TO REDUCE UNCERTAINTY FOR INSURERS AND TO STABILIZE PREMIUMS

Upon its enactment on March 23, 2010, the ACA created a series of programs and

effectuated a number of health care reforms.  The ACA was intended to increase competition in health insurance markets and to expand health insurance coverage to millions of uninsured Americans.  Declaration of M. Kate Bundorf ("Bundorf Decl.") ¶¶ 7, 9.  To this end, it established Health Insurance Marketplaces, also called "Health Benefit Exchanges" (the "Exchanges").  These Exchanges enabled insurers to sell individual and small group plans.  For health plans issued through the Exchange, these plans were required to satisfy specific criteria. Such plans are known as "Qualified Health Plans," or "QHPs."  *See* 42 U.S.C. § 18021.

A.       **The ACA Created the 3Rs to Work Together to Stabilize and Mitigate Risk**

In the first few years of the Exchanges, experts anticipated that QHP issuers would face significant challenges and uncertainty in setting insurance premiums.  *See* Bundorf Decl. ¶ 7.  A key driver behind an insurance company's profits is its ability to actuarially predict how much an average insured will need in terms of health coverage.  *Id.* ¶ 6.  These predictions are used to price the insurer's plan premiums.  *Id.*  Due to the ACA Exchanges' novel makeup, coupled with the ACA requirement for guaranteed issue, QHP issuers could not engage in medical underwriting before providing insurance coverage and did not have any effective way to accurately predict the number and cost of the previously uninsured individuals who would be enrolling in their plans starting in 2014.  *Id.* ¶ 7.

Congress explicitly recognized that this uncertainty could lead insurers to increase premiums and cause instability in the market.  This is precisely why the ACA included three inter-related "premium stabilization programs," *i.e.*, the 3Rs:  reinsurance, risk corridors, and risk adjustment.  42 U.S.C. §§ 18061-18063.  The 3Rs targeted specific uncertainties in the new Exchange markets and, as the Centers for Medicare and Medicaid Services ("CMS")  has explained, were designed "to assist insurers through the transition period, and to create a stable,

7

competitive and fair market for health insurance,"[1] particularly during the first few years of full ACA implementation. *See* Bundorf Decl. ¶¶ 8-9 (explaining the purpose and intended effect of each 3R program).

Discussing the risk corridors program specifically, CMS stated that "[d]ue to uncertainty about the population during the first years of Exchange operation, issuers may not be able to predict their risk accurately, and their premiums may reflect costs that are ultimately lower or higher than predicted." March 2012 Regulatory Impact Analysis, at 44. The risk corridors program would thus "protect against inaccurate rate setting in the early years of the Exchanges by limiting the extent of issuer losses and gains." *Id.* at 43; *see also* Bundorf Decl. ¶¶ 9-11 (discussing how and why a risk corridors program provides such protection).

## II. THE ACA RISK CORRIDORS PROGRAM HAS COMMON REQUIREMENTS AND THE GOVERNMENT'S FAILURE TO PAY HAS HAD COMMON EFFECTS

"The goal of the risk corridors program is to support the [Exchanges] by providing insurers with additional protection against uncertainty in claims costs during the first three years of the [Exchanges]."[2] "Issuers whose premiums exceed claims and other costs by more than a certain amount pay into the program, and insurers whose claims exceed premiums by a certain amount receive payments for their shortfall." *Id.*

### A. Mechanics of the ACA Risk Corridors Program

Section 1342(b) of the ACA mandates that the Secretary of the Department of Health and

---

[1]    CMS, "The Three Rs: An Overview" (Oct. 1, 2015) ("The Three Rs"), *available at* https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2015-Fact-sheets-items/2015-10-01.html (last visited Oct. 5, 2016); *see also* CMS, "Regulatory Impact Analysis," (Mar. 16, 2012) ("March 2012 Regulatory Impact Analysis") at 38, *available at* https://www.cms.gov/CCIIO/Resources/Files/Downloads/hie3r-ria-032012.pdf (last visited Oct. 5, 2016).

[2]   CMS, "The Three Rs," *supra* note 1.

Human Services ("HHS"), for each of the first three years of full ACA implementation, must make risk corridors payments to any QHP issuer that, for the applicable year, had "allowable [health care] costs" that were more than three percent greater than a "target amount":

(b) PAYMENT METHODOLOGY. —

(1) PAYMENTS OUT. — The Secretary shall provide under the program established under subsection (a) that if —

(A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(2) PAYMENTS IN.—The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

42 U.S.C. § 18062(b). Both "allowable costs" and "target amounts" are defined on a plan year basis. *See* 42 U.S.C. § 18062(c)(1)(A) (defining allowable costs as certain costs "of a plan for any year"); 42 U.S.C. § 18062(c)(2) (defining "target amount" as total premiums less administrative costs "of a plan for any year").

If a plan's allowable costs are more than three percent above the total of the plan's

premium revenue less the plan's administrative costs, the plan shall receive a payment equal to 50 percent or more of the plan's costs over that three percent threshold.  The annual risk adjustment and reinsurance payments are part of the calculation of a plan's allowable costs.  42 U.S.C. § 18062(c)(1)(B); 45 C.F.R. §153.530(b).

All Class members are subject to the requirements set by HHS for participants in the risk corridor program, must satisfy certain requirements with respect to defining their premium data, allowable costs, and administrative costs, and must submit all necessary information for the risk corridor payment calculations by certain points established by statute, regulation, and HHS. 45 CFR §§ 153.510, 153.530.   If QHP issuers abided by these requirements and satisfied the necessary criteria, they were eligible for "payments out" from the risk corridor program once the payments were calculated.  Compl. ¶ 23.

B.    **The Government's Failure to Make Timely Full Payments Has Had Classwide Effects**

On December 16, 2014, a year after QHP issuers already began offering insurance through the ACA-created Exchanges, Congress enacted the 2015 Spending Bill, which contained, among other provisions, a rider eliminating CMS/HHS's ability to make risk corridors payments from appropriated funds.  *See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2491 (the "2015 Spending Bill") at 362.  This was also over eighteen months after Class member QHP issuers submitted proposed insurance premiums for regulatory approval.  Compl. ¶ 36.  Congress included a similar provision in the following year's appropriations bill, Pub. L. No. 114-113 (the "2016 Spending Bill"), this time further specifying that special amounts appropriated to CMS and HHS in 2016 could not be used to fund the risk corridors program.  Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2624-25.

Pursuant to their obligations under the Affordable Care Act and 45 CFR § 153.500 *et seq.*, Plaintiff and the Class members complied with their statutory requirements throughout the year and submitted all required data for the risk corridor calculations by July 31, 2015, the statutory deadline.  *See* 45 CFR § 153.530(d).  The Government then calculated the risk corridor payments in and out, and, after notifying the market of a month extension, announced the results on October 1, 2015.  Compl. ¶ 40.

Due to a variety of factors—including, among other things, the expected pricing risks in a new insurance market with dramatically new demographics and new benefit requirements, as well as a higher-than-expected percentage of sick individuals due to certain policy changes in 2013 that allowed consumers to renew non-ACA compliant health plans even after the Affordable Care Act became effective—Plaintiff and the Class suffered substantial losses in 2014.  Compl. ¶ 41.  Based on the Government's own official calculation, QHPs generated $362 million in risk corridor gains for the Government, but suffered $2.87 billion in compensable risk corridor losses.  Compl. ¶ 41.  In CMS's October 1, 2015 statement, it informed Plaintiff and the Class that they would receive just 12.6% of the amounts they were owed under the risk corridor program, which reflected a prorated distribution of the $362 million received from the few insurers that were required to pay the Government for the 2014 program year.  *Id.*  Each Class member received the same 87.4% reduction in the money it was owed.  *See id.* ¶¶ 41, 45.

## ARGUMENT

## I.       THE CLASS SHOULD BE CERTIFIED

A district court must undertake a "rigorous analysis" to determine whether the Rule 23 requirements for class certification have been satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *see also Geneva Rock Prod., Inc. v. United States*, 100 Fed. Cl. 778, 782 (2011) (stating that RCFC 23 "closely tracks the language of its analogue in the Federal Rules of

Civil Procedure, and consequently this court has often looked to cases applying Fed. R. Civ. P. 23 to interpret RCFC 23"). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351; *see In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008) ("An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met").  At the same time, as the Supreme Court has reiterated, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (*citing Wal-Mart,* 564 U.S. at 351).  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195.

The proposed class satisfies the requirements of RCFC 23, which have been "succinctly described as comprising inquiry into the elements of numerosity, commonality, typicality, adequacy, and superiority."  *Singleton,* 92 Fed. Cl. at 82; RCFC  23; *see  also Geneva  Rock Prods., Inc. v. United States,* 100 Fed. Cl. 778, 782 (2011).

A class action is maintainable under RCFC 23 when:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

RCFC 23(a).  In addition, for the class action to maintainable under RCFC 23(b), the court must find that "'the United States has acted or refused to act on grounds generally applicable to the

class,' that the common questions of law and fact predominate, and that the class action is superior to other methods for adjudicating the controversy." *Singleton,* 92 Fed. Cl. at 81-82 (quoting RCFC 23(b)).

Courts applying RCFC 23 have recognized that the rule should be accorded "a liberal construction," which "serves public purposes of judicial economy and efficiency." *Singleton,* 92 Fed. Cl. at 82.  Moreover, "the rule assumes that the court may certify a class on the basis of the complaint." *Toscano v. United States,* 98 Fed. Cl. 152, 154 (2011); *Douglas R. Bigelow Trust v. United States,* 97 Fed. Cl. 674, 676 (2011) (stating "the court must assume the truth of the factual assertions contained in the complaint").

## A.  The Requirements of Rule 23(a) and (b) Are Readily Satisfied

### 1.  Numerosity

RCFC 23(a)(1) permits class certification if "the class is so numerous that joinder of all members is impracticable."  RCFC 23(a)(1).  "Impracticable" does not mean that joinder must be "impossible." *King v. United States*, 84 Fed. Cl. 120, 123 (2008) (citing *Barnes v. United States*, 68 Fed. Cl. 492, 495 (2005)).  Instead, the rule "requires examination of the specific facts of each case and imposes no absolute limitations." *Singleton*, 92 Fed. Cl. at 83 (quoting *Gen. Tel. Co. of the Nw., Inc. v. Equal Opportunity Comm'n,* 446 U.S. 318, 330 (1980) (internal alteration omitted)).  Among the factors that courts evaluate when assessing the numerosity requirement are the number of potential class members, the geographic dispersal of members of the proposed class, and the size of individual claims. *King*, 84 Fed. Cl. at 123-125; *Geneva Rock*, 100 Fed. Cl. at 787.  The fact that the Rules of the Court of Federal Claims permit only opt-in class actions renders the numerosity criterion "somewhat of an anomaly." *Haggart v. United States*, 89 Fed. Cl. 523, 530 (2009) ("Haggart I").  Because inclusion in the class requires affirmative effort on the part of class members, the need for stringent safeguards is less significant in class actions

here than in opt-out class actions.  *See, e.g., Jones v. United States*, 118 Fed. Cl. 728, 733 n.2 (2014) (contrasting opt-in actions with opt-out actions, "in which the stakes of not contacting a class member are high").

The numerical size of the proposed class is the most important factor in determining numerosity.  *Brown v. United States*, 126 Fed. Cl. 571, 577 (2016).  Although there is no "magic number" that triggers a presumption of numerosity, *Singleton*, 92 Fed. Cl. at 83, "[i]n one popular view, any class larger than 40 is assumed to be sufficiently numerous."  *Geneva Rock*, 100 Fed. Cl. at 787 (citing *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir. 2001)); *King*, 84 Fed. Cl. at 124 ("While not outcome determinative, the number of potential class members is persuasive when determining numerosity: generally, if there are more than forty potential class members, this prong has been met.").

In *Singleton*, for example, even though the potential class members were clustered in a tight geographic area, the court found the numerosity requirement satisfied where "joinder of the estimated 135 potential claimants would entail a sufficient degree of extra difficulty and/or expense that makes it 'impracticable.'"  92 Fed. Cl. at 84.  Classes consisting of fewer than two dozen members have been certified where doing so "promotes judicial economy because the alternative is multiple suits against the government."  *Sears v. United States*, 124 Fed. Cl. 444, 450 (2015) (certifying subclass of 21 members).  *See also Haggart v. United States,* 104 Fed. Cl. 484, 489 (2012) ("Haggart II") (certifying subclasses of 18 and 25 members); *Bigelow Trust* at 676 (certifying class that "likely exceeds 25" members); *Geneva Rock*, 100 Fed. Cl. at 788 (certifying class of 23 members).[3]

---

[3]  Courts routinely certify classes consisting of fewer than 100 members.  *See, e.g., Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (finding no abuse of discretion in certification of class number 74 class members); *In re Cincinnati Radiation Litig.*, 187 F.R.D. 549, 552 (S.D. Ohio 1999) (80 class members); *Sagers v. Yellow Freight Sys., Inc.*, 529 F.2d

Roughly 200 providers are owed money under the risk corridors provision of the ACA for 2014,[4] and once the Government finishes the process of calculating the numbers for 2015, the number of providers owed risk corridors payments will likely grow.   The number of class members is significantly larger than many classes routinely certified, and the "extra difficulty and/or expense" involved in seeking to join each of them in this lawsuit satisfies the numerosity prong.  *Singleton*, 92 Fed. Cl. at 84.  The alternative to class treatment is for individual plaintiffs to file individual cases, take the case to judgment, and potentially receive inconsistent rulings on the same legal issues before different judges.  On the other hand, "certification of the proposed class will allow for consolidation of these claims, thereby reducing the time and expense of litigation [and] ensuring a consistent decision regarding the Government's liability."  *DeMons v. United States*, 119 Fed. Cl. 345, 357 (2014); *see also Bright v. United States*, 603 F.3d 1273, 1285 (Fed. Cir. 2010) ("In short, we think that, all other considerations being equal, the laudable goal of avoiding 'multiplicity of actions' should prevail.")

That members of the class are located throughout the country also weighs in favor of finding the numerosity prong satisfied.   Although "not a heavily weighted factor" in the numerosity calculation, "[i]t is well settled that joinder is less practicable when potential class members are dispersed geographically."   *Brown*, 126 Fed. Cl. at 578-79 (citations omitted); *King*, 84 Fed. Cl. at 124-25 ("If plaintiffs are dispersed geographically, then a court is more likely to certify a class action.").  It is difficult to imagine a class with wider geographic dispersal than here, where potential Class members are scattered throughout nearly every one of the 50

---

721, 734 (5th Cir. 1976) (holding 110 class members "clearly a sufficient number to meet the numerosity requirements of Rule 23(a)(1)).  In addition, under the Class Action Fairness Act, among the factors triggering federal jurisdiction is that a minimally diverse class action consists of 100 or more class members.  28 U.S.C. 1332(d)(5)(B).

[4]   CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015).

states, further tilting the scale in favor of numerosity.  *See Markham v. White*, 171 F.R.D. 217, 221 (N.D. Ill. 1997) (finding the numerosity requirement satisfied where the class of between 47 to 52 sexual harassment victims was scattered among five states).[5]

Finally, without the class device, many of the Class members' claims might not be litigated at all.  While some members of the class have very large claims, a number of Class members have claims small enough that they might not be the subject of litigation if left on an individual basis.  For example, UnitedHealthcare of New England, Inc. (RI) is owed $666.47 for 2014; Community First Health Plans, Inc. (TX) is owed approximately $9,400; and BridgeSpan Health Company (ID) is owed less than $24,400,[6] amounts small enough that retaining counsel to pursue the claims might "overwhelm their potential recoveries."  *Brown*, 126 Fed. Cl. at 579.

### 2.    Commonality

The commonality requirement consists of a three-part test from related requirements of RCFC 23(a)(2) and (b):

> Commonality is a three-part test.  RCFC 23(a)(2) requires that there be questions of law or fact common to the class; RCFC 23(b)(2) requires that the United States has acted or refused to act on grounds generally applicable to the class; and RCFC 23(b)(3) requires that the questions of law and fact common to class members predominate over questions particular to individual class members.

*Singleton,* 92 Fed. Cl. at 84; *see also Geneva Rock,* 100 Fed. Cl. at 788.  All three prongs are met here.

### (a)    Common Issues

Rule 23(a)(2) requires that there "be questions of law or fact common to the class."

---

[5]  "In general, cases applying [Fed. R. Civ. P. 23] have been examined and followed in interpreting RCFC 23."  *Haggart II*, 104 Fed. Cl. at 488 (internal quotation marks and citation omitted).

[6]  CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015), at 9, 24, 27.

RCFC 23(a)(2).   Commonality is established where a classwide proceeding may "generate common answers apt to drive the resolution of the litigation."  *Wal-Mart Stores*, 564 U.S. at 350 (citation omitted).  Plaintiffs seeking to establish the existence of a common factual or legal issue must demonstrate that the putative class members' claims "depend upon a common contention . . . that it is capable of classwide resolution" and will "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*; *see also King v. United States*, 84 Fed. Cl. 120, 126 (2008) ("commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members") (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)).  The commonality requirement poses a low hurdle.  *Singleton*, 92 Fed. Cl. at 84.  Indeed, "even a single common question will do."  *Dukes*, 564 U.S. at 359 (alterations and citation omitted).

Questions of law and fact common to the Class that relate to the Government's failure to timely make full risk corridors payments include but are not limited to:

- whether Section 1342 of the Affordable Care Act is a money-mandating statute;

- whether 45 CFR § 153.510 is a money-mandating regulation;

- whether the Government's failure to appropriate funds sufficient to make risk corridor payments to Plaintiff and the Class absolve it of its statutory obligations;

- whether the Government violated its obligations to pay Plaintiff and the Class risk corridor amounts in a reasonable time following the official calculation of those amounts; and

- whether the Government is liable to Plaintiff and the Class for failing to make risk corridor payments within a reasonable time following the official calculation of those amounts.

Any one of these issues would, standing alone, establish the requisite commonality under RCFC 23(a)(2).

**(b)      Similar Treatment**

RCFC 23(b)(2) requires that in order to maintain a class action, the United States must have "acted or refused to act on grounds generally applicable to the class."  RCFC 23(b)(1).  Where a "single act is the wellspring of all the putative class members' claims," there "can be little question that the government acted on grounds applicable to the entire class" and the similar-treatment prong of the commonality test is satisfied.  *Geneva Rock,* 100 Fed. Cl. at 788-89; *see generally Bigelow Trust,* 97 Fed. Cl. at 678; *Adams v. United States,* 93 Fed. Cl. 563, 575-76 (2010); *Haggart I,* 89 Fed. Cl. at 534; *see also Gross v. United States*, 106 Fed. Cl. 369, 380 (2012); *Barnes,* 68 Fed. Cl. at 496.

Here, the Government has failed to make risk corridors payments within a reasonable time following the official calculation of those amounts.  This failure to comply with its statutory obligation is a single course of conduct that applies to the entire potential class of plaintiffs.

**(c)      Predominance**

A court certifying a class must find that under RCFC 23(b)(3), "questions of law or fact common to class members predominate over any questions affecting only individual members."  RCFC 23(b)(3).  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997).  This requirement calls upon courts to examine whether individual questions – "where members of a proposed class will need to present evidence that varies from member to member" – or common questions – "where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof" – are more prevalent.  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks, alteration, and citation omitted).  When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be

considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (citing 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)); *see also Barnes*, 68 Fed. Cl. at 496 (finding predominance "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof") (citing *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir. 2002)).

Even "factual variation among the class grievances is acceptable as long as a common nucleus of operative fact exists." *Curry v. United States*, 81 Fed. Cl. 328, 334 (2008) (internal quotation marks and citation omitted). In *Barnes*, for example, even though the class members varied in the amount of hours they worked and the potential overtime pay to which they may be entitled, the Navy's systemic failure to comply with overtime-pay statutes predominated over any individual differences among the class. 68 Fed. Cl. at 496-97. *See also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1437 (2013) (Ginsburg and Breyer, JJ., dissenting) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.").

Classwide issues far predominate over individual issues here. The members of the Class are subject to the same regulatory regime under the risk corridors provision of the ACA—the same requirements to be QHP issuers, the same obligations to provide ACA-compliant insurance plans, the same requirements to track allowable costs and target amounts, the same reporting requirements, the same "payment in" requirements, and the same rights to "payments out." Participating in the same program, they were all affected by the same decisions made by the

Government in the same way.  The determination of whether the Government breached its obligation to make full annual payments and what those payments should be are issues "susceptible to generalized, class-wide proof" for which the Class will look to common evidence and for which the proof will generate common answers.  *Tyson Foods*, 136 S. Ct. at 1045.  All Class members will look to the same documents to determine both liability and damages, which the Government has already calculated.[7]

### 3.     Typicality

RCFC 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  RCFC 23(a)(3).  Typicality "is intertwined with commonality," and the "named plaintiff need only show that its claims share the same essential characteristics as the claims of the class at large." *Geneva Rock,* 100 Fed. Cl. at 789-90 (quotation marks and internal citations omitted).  "[T]he threshold is not high." *Singleton,* 92 Fed. Cl. at 84; *Bigelow Trust,* 97 Fed. Cl. at 678.  Thus, the requirement is satisfied if the claims "of the representatives and the members of the class stem from a single event or unitary course of conduct, or if they are based on the same legal or remedial theory." *Geneva Rock,* 100 Fed. Cl. at 790 (citations omitted); *Bigelow Trust,* 97 Fed. Cl. at 678; *see also* NEWBERG ON CLASS ACTIONS § 3.29 (5th ed.) ("A plaintiff with typical claims will pursue his or her own self-interest in the litigation and, in so doing, will advance the interests of the class members, which are aligned with those of the representative.").

Here, typicality is easily satisfied, because the representative parties are stating the same claim, concerning the same conduct, and seeking the same relief as all members of the proposed Class.  *Fisher v. United States*, 69 Fed. Cl. 193, 200 (2006) (finding this "modest threshold"

---

[7]  *See* CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015).

satisfied where "all prospective plaintiffs would be proceeding under essentially the same legal claim"). If the named plaintiff can prove its claims, it would be proving the claims of all Class members.

### 4. Adequacy

RCFC 23(a)'s final requirement mandates that the representative parties "fairly and adequately protect the interests of the class." RCFC 23(a)(4). The adequacy of representation requirement "has been held to encompass two components: adequacy of counsel as well as lack of conflict between the interests of named plaintiffs and the proposed class members." *Singleton,* 92 Fed. Cl. at 85 (citation omitted); *see also Adams,* 93 Fed. Cl. at 576. Each prong is satisfied.

### (a) Adequacy of Representation

Proposed Class counsel is "qualified, experienced and generally able to conduct the litigation." *Adams,* 93 Fed. Cl. at 576. In appointing class counsel, a court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in this action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. RCFC 23(g)(1)(A). A court must also look to whether the proposed interim class counsel will fairly and adequately represent the interests of the class. RCFC 23(g)(4).

This case filed on behalf of Health Republic by Quinn Emanuel was the first of its kind seeking to recover risk corridors payments from the Government. Decl. of Stephen A. Swedlow ¶ 3. Several month later, several other QHP Issuers filed similar suits in this court and others, pursuing the same payments under the same legal theories. *Id.* ¶ 4. Quinn Emanuel, on behalf of Health Republic and the putative Class, has now fully briefed the Government's Motion to

Dismiss.  As a consequence, no other firm has more expertise than Quinn Emanuel in in the substantive law and policy at issue in these cases.

In addition, there can be no dispute that the individual attorneys leading this litigation, as well as the law firm of Quinn Emanuel, collectively possess the experience and expertise to represent the interests of the Class.  The three primary Quinn Emanuel attorneys leading this litigation are experienced trial lawyers, have tried multiple class action cases to verdict, and have obtained several nine-figure class action settlements.  *Id.* ¶¶ 8-10.  As a firm, Quinn Emanuel, which is the largest firm in the United States devoted solely to business litigation, is consistently recognized as among the best law firms in the world and has won several awards specifically for its class-action practice.  *Id.* ¶¶ 5-7.

Finally, Quinn Emanuel is willing to invest the resources necessary to litigate this case through trial and beyond, as appropriate.  Quinn Emanuel has committed its substantial resources to this case and will continue to zealously represent the interests of the putative Class.

### (b)    Lack of Conflict

There are no "conflicting, competing, or antagonistic interests as between the named Plaintiffs and the proposed class" that would warrant a finding that the named plaintiff would not adequately protect the class's interest.  *Singleton*, 92 Fed. Cl. at 86.  Class members have a united interest in establishing the factual and legal basis of their claims, and there is no basis by which "the putative class members have interests that would put them at odds with one another."  *Geneva Rock,* 100 Fed. Cl. at 790.  "[B]ecause all plaintiffs would assert the same legal claim . . . arising out of the same government actions," the interests of the named plaintiff and the proposed class are aligned rather than opposed.  *Haggart I*, 89 Fed. Cl. at 535.

### 5.    Superiority

Finally, a plaintiff must demonstrate that a class action is "superior to other available

methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(3).  The superiority requirement is met where "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Gross*, 106 Fed. Cl. at 383 (quoting FRCP 23 Advisory Committee Note (1966 Amendment)).  Among the non-exhaustive factors that a court considers are the "class members' interests in individually controlling the prosecution of separate actions," RCFC 23(b)(3)(A); the "extent and nature of any litigation concerning the controversy already begun by class members," RCFC 23(b)(3)(B); and "the likely difficulties in managing a class action," RCFC 23(b)(3)(D).  "Essentially, under this prong of the analysis, the court is obliged to conduct a cost-benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and the individual members likely to be derived from maintaining such an action." *Geneva Rock*, 100 Fed. Cl. at 790 (alteration and internal citation omitted).

Not only is a class action superior to joinder or individual adjudication of the claims, but this case is in many respects the prototype for the sort of action warranting class treatment.  A single Government action affected each of the Class members in exactly the same way, and the Government has a list of each member of the potential Class and has already calculated how much it owes each of them for 2014 and is in the process for making the same calculations for 2015.  Resolution of the legal issues in this case on a classwide basis will "achieve economies of scale in time, effort, and expense because the court is dealing with common questions of law and fact." *Fauvergue v. United States*, 86 Fed. Cl. 82, 101 (2009), *rev'd on other grounds sub nom. Bright v. United States*, 603 F.3d 1273 (Fed. Cir. 2010); *see also King*, 84 Fed. Cl. at 128 ("Conducting this case as a class action is likely to achieve efficiencies in the use of the

resources of both the parties and the court.")

The discrete categories of RCFC 23(b)(3) weigh in favor of a finding of superiority. There is nothing to indicate that a Class member would benefit from individually controlling an action, and because the Court of Federal Claims permits only opt-in classes, RCFC 23(c)(2)(B)(v), there is no concern that a Class member might be swallowed into a class that it would prefer not to participate in.  This action was also the first suit filed demanding payment under the risk corridors provision; while a small handful of others has since been filed, they remain in their infancy and make similar claims than the plaintiff Class does here.[8]  Finally, there are no "likely difficulties," RCFC 23(b)(3)(D), in managing the Class.  This is a discrete Class with a common claim arising out of the same statute and about whom the Government has information and has even calculated damages.  *See Adams*, 93 Fed. Cl. at 577–78 (finding manageability where "the Government can mechanically identify and notify potential class members, as well as calculate their individual damages").

Where, as here, "[a]ll plaintiffs are affected by the same [government action], the defenses the government will likely use in response to plaintiffs' claims should be identical, and the law which the court will apply to resolve plaintiffs' claims should also be identical," the superiority requirement is met.  *Singleton*, 92 Fed. Cl. at 86 (quotation marks and citation omitted).  Under these circumstances, treatment of the legal issues on a classwide basis will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated."  *Gross*, 106 Fed. Cl. at 383 (internal quotation omitted); *see also*

---

[8]   Six of them are pending in the Court of Federal Claims and one is pending in another federal court.  *See First Priority Life Ins. Co. v. U.S.*, No. 1:16-cv-587 (Fed. Cl.); *Moda Health Plan, Inc. v. U.S.*, No. 1:16-cv-649 (Fed. Cl.); *Blue Cross & Blue Shield of North Carolina v. United States*, No. 1:16-cv-651 (Fed. Cl.); *Land of Lincoln Mutual Health Ins. Co. v. United States*, No. 1:16-cv-744 (Fed. Cl.); *Maine Community Health Options v. United States*, No. 16-cv-967 (Fed. Cl.); *New Mexico Health Connections v. United States*, No. 1:16-cv-1199 (Fed. Cl.); *Evergreen Health Cooperative Inc. v. U.S. Dep't of Health & Human Servs.*, No. 1:16-cv-2039 (D. Md.).

*Bigelow Trust*, 97 Fed. Cl. at 678 n.7 (finding the superiority requirement met where there was no claim "that the pursuit of a class action here would be less efficient than pursuing the claims represented here in individual or consolidated actions").

In short, "certification of the proposed class will allow for consolidation of these claims, thereby reducing the time and expense of litigation [and] ensuring a consistent decision regarding the Government's liability." *DeMons*, 119 Fed. Cl. at 357.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion for Class Certification.

DATED:  October 5, 2016

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


*/s/ Stephen Swedlow*_____
Stephen Swedlow
stephenswedlow@quinnemanuel.com
500 W. Madison Street, Suite 2450
Chicago, Illinois 60661-2510
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

J.D. Horton
jdhorton@quinnemanuel.com
Adam B. Wolfson
adamwolfson@quinnemanuel.com
865 S. Figueroa Street
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Plaintiff Health Republic
Insurance Company and the Class

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 5, 2016, a copy of the attached Motion for Class Certification was served via the Court's CM/ECF system on Defendant's counsel Charles Edward Canter.

 */s/ Stephen Swedlow*
Stephen Swedlow