# In the United States Court of Federal Claims

No. 16-259C
(Filed: January 10, 2017)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| HEALTH REPUBLIC INSURANCE COMPANY, | * * * | Section 1342 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18062; 45 C.F.R. pt. 153; Risk Corridors Program; |
| Plaintiff, | * * | RCFC 12(b)(1) Motion to Dismiss; Subject Matter Jurisdiction; Money-Mandating |
| v. | * * | Statute and Regulation; Presently Due Money Damages; Ripeness; Agency |
| THE UNITED STATES, | * * | Interpretation of Its Own Regulations; Requirement of Annual Risk Corridors |
| Defendant. | * | Payments |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Stephen Swedlow, Chicago, IL, for plaintiff.

Charles E. Canter, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff Health Republic Insurance Company contends, for itself and on behalf of those similarly situated, that defendant United States has not fully paid the risk corridors payments to which it and other insurers are entitled under the Patient Protection and Affordable Care Act ("Affordable Care Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010), and its implementing regulations. Defendant moves to dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). As explained below, the court grants in part and denies in part defendant's motion.

## I. BACKGROUND

### A. The Affordable Care Act

Congress enacted the Affordable Care Act in March 2010. 124 Stat. at 119. The Act includes "a series of interlocking reforms designed to expand coverage in the individual health insurance market." King v. Burwell, 135 S. Ct. 2480, 2485 (2015).

First, the Act bars insurers from taking a person's health into account when deciding whether to sell health insurance or how much to charge. Second, the Act

generally requires each person to maintain insurance coverage or make a payment
to the Internal Revenue Service.  And third, the Act gives tax credits to certain
people to make insurance more affordable.

Id.; accord 26 U.S.C. §§ 36B, 5000A (2012); 42 U.S.C. § 300gg-1 (2012).  "These three reforms
are closely intertwined.  . . .  Congress found that the guaranteed issue and community rating
requirements would not work without the coverage requirement.  And the coverage requirement
would not work without the tax credits."  King, 135 S. Ct. at 2487 (citation omitted).

In conjunction with these three reforms, the Affordable Care Act required the
establishment of an American Health Benefit Exchange ("exchange") in each state by January 1,
2014, to facilitate the purchase of "qualified health plans" by individuals and small businesses.
42 U.S.C. §§ 18031, 18041; accord King, 135 S. Ct. at 2485 (describing an exchange as "a
marketplace that allows people to compare and purchase insurance plans").  Among other
requirements, each "qualified health plan" offered on an exchange must provide a package of
"essential health benefits."  42 U.S.C. § 18021(a)(1).

Thus, when enacted, the Affordable Care Act provided benefits and risks for health
insurance companies ("insurers").  On the one hand, insurers would have access to a market of
previously uninsured individuals, which could result in the insurers attracting more customers.
See King, 135 S. Ct. at 2485; accord 42 U.S.C. § 18091(2)(C) ("The requirement [to maintain
insurance coverage], together with the other provisions of this Act, will add millions of new
consumers to the health insurance market . . . .").  On the other hand, because insurers lacked
data "to predict the needs of the newly-insured" individuals, they would be hampered in their
ability to "price [qualified health] plans to reflect the medical costs associated with this new and
untested marketplace."  Compl. ¶ 2; accord id. ¶ 26 ("[I]nsurers generally have less experience in
how to accurately price policies in the individual market rather than the group market, and no
relevant experience estimating benefit utilization, risk pool composition, and medical spending
costs for insurance policies to the post-[Affordable Care Act] market, which included a new
demographic and new mandatory coverage requirements.").  To mitigate the risk faced by
insurers, the Affordable Care Act included three premium stabilization programs:  a transitional
reinsurance program, a permanent risk adjustment program, and a temporary risk corridors
program.  See id. ¶¶ 4, 20; 42 U.S.C. §§ 18061-18063.

The transitional reinsurance program required insurers to fund, for the three-year period
beginning January 1, 2014, reinsurance entities that would make payments to insurers that
covered high-risk individuals "for any plan year beginning" in the three-year period.  42 U.S.C.
§ 18061.  The permanent risk adjustment program requires each state to "assess a charge on
health plans and health insurance issuers (with respect to health insurance coverage) . . . if the
actuarial risk of the enrollees of such plans or coverage for a year is less than the average
actuarial risk of all enrollees in all plans or coverage in such State for such year" and "provide a
payment to health plans and health insurance issuers (with respect to health insurance coverage)
. . . if the actuarial risk of the enrollees of such plans or coverage for a year is greater than the

average actuarial risk of all enrollees in all plans and coverage in such State for such year . . . ." Id. § 18063.

The third program–the one at issue in this case–is the temporary risk corridors program. Pursuant to section 1342 of the Affordable Care Act:

> The Secretary [of the Department of Health and Human Services ("HHS")] shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w-101 et seq.].

42 U.S.C. § 18062(a) (first alteration added). Section 1342 describes the methodology for collecting and making payments that HHS was required to adopt:

> (1)  Payments out
>
>> The Secretary shall provide under the program established under subsection (a) that if–
>>
>>> (A)  a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>>>
>>> (B)  a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.
>
> (2)  Payments in
>
>> The Secretary shall provide under the program established under subsection (a) that if–
>>
>>> (A)  a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

> (B)  a participating plan's allowable costs for any plan year are less
> than 92 percent of the target amount, the plan shall pay to the Secretary an
> amount equal to the sum of 2.5 percent of the target amount plus 80
> percent of the excess of 92 percent of the target amount over the allowable
> costs.

Id. § 18062(b).  "The amount of allowable costs of a plan for any year is an amount equal to the total costs (other than administrative costs) of the plan in providing benefits covered by the plan," minus "any risk adjustment and reinsurance payments received under section[s] 18061 and 18063 . . . ."  Id. § 18062(c)(1).  And, the "target amount of a plan for any year is an amount equal to the total premiums (including any premium subsidies under any governmental program), reduced by the administrative costs of the plan."  Id. § 18062(c)(2).  Neither section 1342 of the Affordable Care Act nor any of the Act's other provisions appropriated funds specifically for the risk corridors program.  See generally Pub. L. No. 111-148, 124 Stat. at 119-1024.

## B.  Regulations Implementing the Risk Corridors Program

As contemplated by the Affordable Care Act, the Secretary of HHS established a risk corridors program.  Proposed regulations first appeared in the Federal Register on July 15, 2011.  See Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 76 Fed. Reg. 41,930 (to be codified at 45 C.F.R. pt. 153).  HHS explained that the temporary risk corridors program was, in general, "designed to provide QHP issuers with greater payment stability as insurance market reforms are implemented" and would "protect against uncertainty in setting rates in the Exchange by limiting the extent of issuer losses (and gains)."[1]  Id. at 41,931; accord id. at 41,948.  In addition, HHS noted that although the proposed regulations did not contain any deadlines for qualified health plans to remit charges to HHS or for HHS to make risk corridors payments to qualified health plans, such deadlines were under consideration:

> For example, a QHP issuer required to make a risk corridor payment may be
> required to remit charges within 30 days of receiving notice from HHS.  Similarly,
> HHS would make payments to QHP issuers that are owed risk corridor amounts
> from HHS within a 30-day period after HHS determines that a payment should be
> made to the QHP issuer.  We believe that QHP issuers who are owed these
> amounts will want prompt payment, and also believe that the payment deadlines
> should be the same for HHS and QHP issuers.

Id. at 41,943.  Finally, with respect to the expected cost of the risk corridors program, HHS stated, in a summary of its preliminary regulatory impact analysis:

---

[1]  HHS frequently abbreviates "qualified health plan" as "QHP" in its regulations.

> [The Congressional Budget Office ("CBO")] estimated program payments and receipts for reinsurance and risk adjustment. . . . CBO did not score the impact of risk corridors, but assumed collections would equal payments to plans in the aggregate. The payments and receipts in risk adjustment, reinsurance, and risk corridors are financial transfers between issuers.

Id. at 41,948. But see id. at 41,942 ("Risk corridors create a mechanism for sharing risk for allowable costs between the Federal government and QHP issuers.").

After a notice-and-comment period, HHS published a final rule on March 23, 2012. See Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment ("Premium Stabilization Rule"), 77 Fed. Reg. 17,220 (to be codified at 45 C.F.R. pt. 153). In this final rule, HHS reiterated the explanatory remarks set forth in its proposed rule. See id. at 17,221, 17,236, 17,238. In addition, because HHS had separately issued a final regulatory impact analysis, see Def.'s App. 2 at 2-53,[2] it updated its discussion of the expected cost of the risk corridors program:

> CBO estimated program payments and receipts for reinsurance and risk adjustment. . . . CBO did not score the impact of the risk corridors program, but assumed collections would equal payments to plans in the aggregate. The payments and receipts in risk adjustment and reinsurance are financial transfers between issuers and the entities running those programs.

77 Fed. Reg. at 17,244; accord Def.'s App. 2 at 11 ("CBO did not score the impact of risk corridors and assumed collections would equal payments to plans and would therefore be budget neutral."), 40 ("CBO did not separately estimate the program costs of risk corridors, but assumed aggregate collections from some issuers would offset payments made to other issuers."). HHS also indicated that it had received several comments regarding deadlines for risk corridors remittances and payments:

> Three commenters agreed that 30 days was a reasonable timeframe for both payments and charges, and one commenter recommended that payments and charges be paid once per year. One commenter suggested requiring issuers of QHPs to submit risk corridors data within 30 days after submission of a request for payment to HHS or receipt of demand for payment from HHS.

77 Fed. Reg. at 17,239. In response to these comments, HHS indicated that it "plan[ned] to address the risk corridors payment deadline in the HHS notice of benefit and payment parameters." Id. Thus, the final regulation establishing the risk corridors and describing the payment methodology, 45 C.F.R. § 153.510, provided only:

---

[2] Because defendant did not paginate its appendices, the court uses the page numbers assigned by its electronic case filing system.

(a) <u>General requirement</u>.  A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridors for calendar years 2014, 2015, and 2016.

(b) <u>HHS payments to health insurance issuers</u>.  QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:

(1)  When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

(2)  When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(c) <u>Health insurance issuers' remittance of charges</u>.  QHP issuers must remit charges to HHS in the following amounts, under the following circumstances:

(1)  If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

(2)  When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

77 Fed. Reg. at 17,251; <u>see also id.</u> ("A QHP issuer must submit to HHS data on the premiums earned with respect to each QHP that the issuer offers in the manner and timeframe set forth in the annual HHS notice of benefit and payment parameters." (codified at 45 C.F.R. § 153.530(a) (2012))).

The notice of benefit and payment parameters mentioned in the Premium Stabilization Rule was published as a proposed rule by the Centers for Medicare and Medicaid Services

("CMS"), an agency of HHS, on December 7, 2012.[3]  See Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014, 77 Fed. Reg. 73,118 (to be codified at 45 C.F.R. pts. 153, 155-158).  In the proposed rule's prefatory remarks, CMS stated:

> The transitional reinsurance program and the temporary risk corridors program, which begin in 2014, are designed to provide issuers with greater payment stability as insurance market reforms are implemented. . . .  The risk corridors program, which is a Federally administered program, will protect against uncertainty in rates for qualified health plans by limiting the extent of issuer losses and gains.  . . .

> In the Premium Stabilization Rule (77 FR 17220), we laid out a regulatory framework for these . . . programs.  In that rule, we stated that the specific payment parameters for those programs would be published in this proposed rule. In this proposed rule, we expand upon these standards, and propose payment parameters for these programs.

Id. at 73,119.  With respect to the risk corridors program, CMS further explained:  "The temporary risk corridors program permits the Federal government and QHPs to share in profits or losses resulting from inaccurate rate setting from 2014 to 2016.  In this proposed rule, we propose . . . an annual schedule for the program and standards for data submissions."  Id. at 73,121.  More specifically, CMS provided:

> We propose to add paragraph (d) to § 153.510, which would specify the due date for QHP issuers to remit risk corridors charges to HHS.  Under this provision, an issuer would be required to remit charges within 30 days after notification of the charges.

> We propose a schedule for the risk corridors program, as follows.  By June 30 of the year following an applicable benefit year, . . . issuers of QHPs will have

---

[3]  The Secretary of HHS had delegated to the Administrator of CMS her authority–granted in section 1342 of the Affordable Care Act–

> to establish and administer a program of risk corridors under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the health plan to the health plan's aggregate premiums based on the program for regional participating provider organizations under part D of Title XVIII of the Social Security Act.

Delegation of Authorities, 76 Fed. Reg. 53,903-04 (Aug. 30, 2011).

been notified of risk adjustment payments and charges for the applicable benefit year.  By that same date, . . . QHP issuers also would have been notified of all reinsurance payments to be made for the applicable benefit year.  As such, we propose in § 153.530(d) that the due date for QHP issuers to submit all information required under § 153.530 of the Premium Stabilization Rule is July 31 of the year following the applicable benefit year.

Id. at 73,164; accord id. at 73,200 ("In this proposed rule, HHS also specifie[s] the annual schedule for the risk corridors program, including dates for claims run-out, data submission, and notification of risk corridors payments and charges.").  CMS remarked that it did not expect that these proposed changes would "significantly alter CBO's estimates of the budget impact of the" risk corridors program.  Id. at 73,196.

After a notice-and-comment period, CMS published a final rule on March 11, 2013.  See Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410 (to be codified at 45 C.F.R. pts. 153, 155-158).  In this final rule, CMS reiterated the prefatory remarks set forth in the proposed rule.  See id. at 15,411-12, 15,515.  CMS also indicated that it received several comments regarding payments, charges, and receipts for the risk corridors program.  Id. at 15,473.  For example, "[o]ne commenter . . . asked for clarification on HHS's plans for funding risk corridors if payments exceed receipts."  Id.  In response, CMS stated:  "The risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act."  Id.  In addition, several commenters provided "supportive comments on [CMS's] proposal to require issuers to submit risk corridors information by July 31 of the year following the applicable benefit year," leading CMS to finalize that proposal.  Id.; see also id. at 15,520 ("In this final rule, HHS also specifies the annual schedule for the risk corridors program, including dates for claims run-out, data submission, and notification of risk corridors payments and charges.").  Thus, 45 C.F.R. § 153.510 was amended by adding the following subsection:  "(d)  Charge submission deadline.  A QHP issuer must remit charges to HHS within 30 days after notification of such charges."  Id. at 15,531.  And, 45 C.F.R. § 153.530 was amended by adding the following subsection:  "(d)  Timeframes.  For each benefit year, a QHP issuer must submit all information required under this section by July 31 of the year following the benefit year."  Id.

On December 2, 2013, CMS published a proposed notice of benefit and payment parameters for 2015.  See Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015, 78 Fed. Reg. 72,322 (to be codified at 45 C.F.R. pts. 144, 147, 153, 155-156).  It noted that on November 14, 2013, the federal government announced that it would allow individuals, between January 1 and October 1, 2014, to renew insurance coverage that did not comply with the "2014 market rules."  Id. at 72,324.  CMS suspected that this "transitional" policy "could increase an issuer's average expected claims cost for plans that comply with the 2014 market rules" and therefore lead to "unexpected losses."  Id.  As a result,

CMS proposed "modifications to a number of programs," including the risk corridors program. Id.  Among other changes, CMS proposed modifying the risk corridors formula for 2014:

> As mentioned elsewhere in this proposed rule, for the 2014 benefit year, we are proposing an adjustment to the risk corridors formula that would help to further mitigate potential QHP issuers' unexpected losses that are attributable to the effects of the transition policy.  This proposed adjustment may increase the total amount of risk corridors payments that the Federal government will make to QHP issuers, and reduce the amount of risk corridors receipts; however, we are considering a number of approaches that would limit the impact of the policy on the Federal budget.  Because of the difficulty associated with predicting State enforcement of 2014 market rules and estimating the enrollment in transitional plans and in QHPs, we cannot estimate the magnitude of this impact on aggregate risk corridors payments and charges at this time.

Id. at 72,379-80.

After a notice-and-comment period, CMS issued a final rule on March 11, 2014.  See Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744 (to be codified at 45 C.F.R. pts. 144, 147, 153, 155-156).  It stated:

> In our proposed rule, we considered an adjustment to the risk corridors formula for the 2014 benefit year that would help to further mitigate any unexpected losses for issuers of plans subject to risk corridors attributable to the effects of the transitional policy, and noted that we were considering approaches that would limit the impact of the policy on the Federal budget.  . . .
>
>      . . . .
>
> We are finalizing the risk corridors adjustment policy as proposed.  . . . We project that these changes, in combination with the changes to the reinsurance program finalized in this rule, will result in net payments that are budget neutral in 2014.  We intend to implement this program in a budget neutral manner, and may make future adjustments, either upward or downward to this program (for example, as discussed below, we may modify the ceiling on allowable administrative costs) to the extent necessary to achieve this goal.

Id. at 13,786-87.  CMS expanded upon the economic impact of its modifications to the risk corridors program:

> The Affordable Care Act created a temporary risk corridors program for the years 2014, 2015, and 2016 that applies to QHPs . . . .  HHS intends to implement this program in a budget neutral manner.

As mentioned elsewhere in this rule, for the 2014 benefit year, we are making an adjustment to the risk corridors formula that would help mitigate potential QHP issuers' unexpected losses that are attributable to the effects of the transitional policy. . . .  Because of the difficulty associated with predicting State enforcement of the 2014 market rules and estimating the enrollment in transitional plans and in QHPs, it is difficult to estimate the precise magnitude of this impact on aggregate risk corridors payments and charges at this time.

Our initial modeling suggests that this adjustment for the transitional policy could increase the total risk corridors payment amount made by the Federal government and decrease risk corridors receipts, resulting in an increase in payments.  However, we estimate that even with this change, the risk corridors program is likely to be budget neutral or, will result in net revenue to the Federal government. . . .  [W]hile the transitional risk corridors adjustment will result in higher risk corridors payments than would occur if no transitional adjustment were in place, we believe that the risk corridors program as a whole will be budget neutral or, will result in net revenue to the Federal government in FY 2015 for the 2014 benefit year.  We note that even with an estimated increase in outlays, CBO still projects the Premium Stabilization programs to reduce the deficit by approximately $8 billion over the budget window.  HHS intends to implement this program in a budget neutral manner.

Id. at 13,829; accord id. at 13,826 ("[W]e were uncertain of the exact magnitude of the effect of the proposed adjustments to the risk corridors and reinsurance programs as a result of the transitional policy . . . ."), 13,827 ("For risk corridors, CBO now estimates the Federal government will pay $8 billion to issuers from [fiscal years] 2015-2017, but that collections for this program will total $16 billion, for a net yield of $8 billion to the Federal government.").

One month after publishing this final rule, on April 11, 2014, CMS issued a two-page memorandum with the subject line "Risk Corridors and Budget Neutrality."  Def.'s App. 2 at 54-55.  The memorandum contained four sets of questions and answers, three of which are relevant here:

Q1:  In the HHS Notice of Benefit and Payment Parameters for 2015 final rule (79 FR 13744) . . . , HHS indicated that it intends to implement the risk corridors program in a budget neutral manner.  What risk corridors payments will HHS make if risk corridors collections for a year are insufficient to fund risk corridors payments for the year, as calculated under the risk corridors formula?

A1:  We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments.  However, if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors

payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.  If, after obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall.  If any risk corridors funds remain after prior and current year payment obligations have been met, they will be held to offset potential insufficiencies in risk corridors collections in the next year.

. . . .

Q2:  What happens if risk corridors collections do not match risk corridors payments in the final year of risk corridors?

A2:  We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments over the life of the three-year program.  However, we will establish in future guidance or rulemaking how we will calculate risk corridors payments if risk corridors collections (plus any excess collections held over from previous years) do not match risk corridors payments as calculated under the risk corridors formula for the final year of the program.

. . . .

Q4:  In the 2015 Payment Notice, HHS stated that it might adjust risk corridors parameters up or down in order to ensure budget neutrality.  Will there be further adjustments to risk corridors in addition to those indicated in this FAQ?

A4:  HHS believes that the approach outlined in this FAQ is the most equitable and efficient approach to implement risk corridors in a budget neutral manner.  However, we may also make adjustments to the program for benefit year 2016 as appropriate.

Id.

## C. Appropriations Acts for Fiscal Years 2015 and 2016

On December 16, 2014, Congress enacted the Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, to fund the federal government

-11-

for the fiscal year ending September 30, 2015, id. § 5, 128 Stat. at 2133.  In the division of the Act appropriating funds for HHS, Congress included the following provision:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the ''Centers for Medicare and Medicaid Services–Program Management'' account, may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors).

Id. at div. G, tit. II, § 227, 128 Stat. at 2491.  In an explanatory statement that was published in the Congressional Record, the chairman of the House Committee of Appropriations remarked:

> In 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral, meaning that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect.  The agreement includes new bill language to prevent the CMS Program Management appropriation account from being used to support risk corridors payments.

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).

One year later, on December 18, 2015, Congress enacted the Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, to fund the federal government for the fiscal year ending September 30, 2016, id. § 5, 129 Stat. at 2244.  That Act provided:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services–Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors).

Id. at div. H, tit. II, § 225, 129 Stat. at 2624.  The Act also provided:

> In addition to the amounts otherwise available for "Centers for Medicare and Medicaid Services, Program Management", the Secretary of Health and Human Services may transfer up to $305,000,000 to such account from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund to support program management activity related to the Medicare Program:  Provided, That except for the foregoing purpose, such funds may not be used to support any provision of Public Law 111-148 or Public Law 111-152 (or any amendment made by either such Public Law) or to supplant any other amounts within such account.

Id. at div. H, tit. II, § 226, 129 Stat. at 2625.  In a June 25, 2015 report accompanying the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Bill, 2016, the Senate Committee on Appropriations explained:  "The Committee continues bill language requiring the administration to operate the Risk Corridor program in a budget neutral manner by prohibiting any funds from the Labor-HHS-Education appropriations bill to be used as payments for the Risk Corridor program."  S. Rep. No. 114-74, at 12.

### D.  The Risk Corridors Program in Practice

Plaintiff "is a nonprofit corporation organized under the laws of the State of Oregon" that provided health insurance on Oregon's exchange in 2014 and 2015.  Compl. ¶ 16.  Based on the data submitted by plaintiff, HHS determined that plaintiff was entitled to a risk corridors payment for 2014 of $7,884,886.15.  Def.'s App. 2 at 80.  However, because the risk corridors payments owed to insurers ($2.87 billion) greatly exceeded the risk corridors charges due from insurers ($362 million), HHS announced, on October 1, 2015, that it would prorate the risk corridors payments.  Id. at 58.  Each insurer that was entitled to a risk corridors payment for 2014 would receive only 12.6% of what it was owed.  Id.; Compl. ¶ 16.  CMS subsequently advised insurers that HHS would begin making risk corridors payments in December 2015.  Def.'s App. 2 at 58.

When it filed its complaint in early 2016, plaintiff estimated that it was owed a risk corridors payment for 2015 of approximately $15 million.  Compl. ¶ 16.  Subsequently, on September 9, 2016, HHS announced preliminary information regarding risk corridors payments for 2015.  See Def.'s Reply Ex.  "[B]ased on [its] preliminary analysis, HHS anticipate[d] that all 2015 benefit year collections will be used towards remaining 2014 benefit year risk corridors payments, and no funds will be available at this time for 2015 benefit year risk corridors payments."  Id. at 1.  HHS confirmed that conclusion in a November 18, 2016 memorandum. See Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year, https://www.cms.gov/CCIIO/ Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINA L-v2.pdf.  In that same memorandum, HHS indicated that plaintiff was entitled to a risk corridors payment of $13,000,493.30 for 2015, id. at 10, that plaintiff could expect to receive $261,922.66 towards its 2014 risk corridors payment, id., and that it would begin making risk corridors payments in December 2016, id. at 2.  Thus, as of the date of this decision, plaintiff has not received its full risk corridors payment for 2014 or any part of its risk corridors payment for 2015.

### E.  Procedural History

Plaintiff filed suit on February 24, 2016, alleging, in its sole claim for relief, that defendant has not fully paid the risk corridors payments to which it and other insurers are entitled

under section 1342 of the Affordable Care Act and its implementing regulations.[4]  It seeks the following relief:  unpaid risk corridors payments; consequential, special, or other damages resulting from defendant's nonpayment; declaratory and injunctive relief; prejudgment and postjudgment interest; and attorneys' fees and costs.

On June 24, 2016, defendant moved to dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).  In its motion, defendant contends that (1) plaintiff does not have a claim for presently due money damages; (2) plaintiff's claim is not ripe; and (3) the court lacks jurisdiction to award certain relief requested by plaintiff, including consequential damages, special damages, interest, declaratory relief, and injunctive relief. Plaintiff filed its response in opposition on August 15, 2016, and defendant filed its reply on September 9, 2016.[5]  In addition, the parties filed short briefs regarding the decision in Land of Lincoln Mutual Health Insurance Co. v. United States, 129 Fed. Cl. 81 (2016), appeal docketed, No. 17-1224 (Fed. Cir. Nov. 16, 2016).  The court deems oral argument unnecessary.

---

[4]  Subsequently, fourteen other suits to recover unpaid risk corridors payments were filed in this court.  See First Priority Life Ins. Co. v. United States, No. 16-587C (filed May 17, 2016); Moda Health Plan, Inc. v. United States, No. 16-649C (filed June 1, 2016); Blue Cross & Blue Shield of N.C. v. United States, No. 16-651C (filed June 2, 2016); Land of Lincoln Mut. Health Ins. Co. v. United States, No. 16-744C (filed June 23, 2016); Me. Cmty. Health Options v. United States, No. 16-967C (filed Aug. 9, 2016); N.M. Health Connections v. United States, No. 16-1199C (filed Sept. 26, 2016); BCBSM, Inc. v. United States, No. 16-1253C (filed Oct. 3, 2016); Blue Cross of Idaho Health Serv., Inc. v. United States, No. 16-1384C (filed Oct. 24, 2016); Minuteman Health Inc. v. United States, No. 16-1418C (filed Oct. 27, 2016); Mont. Health Co-op v. United States, No. 16-1427C (filed Oct. 28, 2016); Alliant Health Plans v. United States, No. 16-1491C (filed Nov. 14, 2016); Blue Cross & Blue Shield of S.C. v. United States, No. 16-1501C (filed Nov. 14, 2016); Neighborhood Health Plan Inc. v. United States, No. 16-1659C (filed Dec. 19, 2016); Health Net, Inc. v. United States, No. 16-1722C (filed Dec. 30, 2016).  Each of the plaintiffs in these cases alleges a failure to pay risk corridors payments in violation of section 1342 of the Affordable Care Act and its implementing regulations.  In addition, some of the plaintiffs allege breach of an express contract, breach of an implied-in-fact contract, breach of the implied duty of good faith and fair dealing, anticipatory breach of contract, and/or an uncompensated taking in violation of the Fifth Amendment to the United States Constitution.

[5]  Subsequently, on October 5, 2016, plaintiff filed motions for class certification and for the appointment of interim class counsel.  The court granted latter motion on October 25, 2016, and the former motion on January 3, 2017.

## II.  DISCUSSION

### A.  Standard of Review

In ruling on a motion to dismiss a complaint pursuant to RCFC 12(b)(1), the court generally assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The allegations in the complaint must include "the facts essential to show jurisdiction." McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936).  If such jurisdictional facts are challenged in a motion to dismiss, the plaintiff "must support them by competent proof."  Id.; accord Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist." (citations omitted)).  Ultimately, the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction.  Trusted Integration, 659 F.3d at 1163.  If the court finds that it lacks subject matter jurisdiction, it must, pursuant to RCFC 12(h)(3), dismiss the complaint.

### B.  The Court Possesses Subject Matter Jurisdiction to Entertain Plaintiff's Claim for Unpaid Risk Corridors Payments

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2012).  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

In this case, plaintiff contends that section 1342 of the Affordable Care Act, 42 U.S.C. § 18062, and the regulation implementing section 1342's payment requirements, 45 C.F.R. § 153.510(b), are money-mandating provisions that entitle it, and other similarly situated insurers, to seek money damages from the United States.  Defendant does not dispute that these two provisions mandate the payment of money to plaintiff and other similarly situated insurers. Indeed, it would be folly to do so.  Section 1342 provides that the Secretary of HHS "shall pay" specified amounts to eligible qualified health plans, 42 U.S.C. § 18062(b)(1), and the regulation implementing this requirement provides that the Secretary of HHS "will pay" specified amounts to issuers of eligible qualified health plans, 45 C.F.R. § 153.510(b).  Such language creates the necessary money mandate.  See Britell v. United States, 372 F.3d 1370, 1378 (Fed. Cir. 2004) ("[T]his type of mandatory language, e.g., 'will pay' or 'shall pay,' creates the necessary 'money-mandate' for Tucker Act purposes."); see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 473 (2003) ("It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages."); Mitchell v. United States, 463 U.S. 206, 219 (1983) (noting that a court must "examine whether [sources of substantive law] can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties they impose"); Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (explaining that a plaintiff must allege "that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum").

Defendant instead argues that the court lacks subject matter jurisdiction to entertain plaintiff's complaint because the Tucker Act's waiver of sovereign immunity is limited to claims for presently due money damages, and plaintiff has not established that its damages are presently due.  In support of this contention, defendant primarily relies upon the decision of the United States Supreme Court ("Supreme Court") in United States v. King.  In that case, the plaintiff alleged

> that the Secretary of the Army's action in rejecting his disability retirement was arbitrary, capricious, not supported by evidence, and therefore unlawful, and asked for a judgment against the United States for an amount of excess taxes he had been compelled to pay because he had been retired for longevity instead of disability.

395 U.S. at 2.  The United States Court of Claims ("Court of Claims"), a predecessor of this court and the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), concluded that the plaintiff's claim "was basically one for a refund of taxes and was therefore barred by [the plaintiff's] failure to allege that he had filed a timely claim for refund" with the Internal Revenue Service.  Id.  However, the Court of Claims concluded that it could instead "exercise jurisdiction under the Declaratory Judgment Act."  Id. (citation omitted).  The Supreme Court, upon examining its precedent, disagreed.  Id. at 3.  It held "that neither the Act creating the Court of Claims nor any amendment to it grants that court jurisdiction of" the plaintiff's case, explaining:

> That is true because [the plaintiff's] claim is not limited to <u>actual, presently due</u>
> <u>money damages</u> from the United States.  Before he is entitled to such a judgment
> he must establish in some court that his retirement by the Secretary of the Army
> for longevity was legally wrong and that he is entitled to a declaration of his right
> to have his military records changed to show that he was retired for disability.
> This is essentially equitable relief of a kind that the Court of Claims has held
> throughout its history, up to the time this present case was decided, that it does not
> have the power to grant.

<u>Id.</u> (emphasis added).  In other words, the plaintiff could not recover the money damages he sought without first obtaining a declaratory judgment, a type of equitable relief that the Court of Claims could not provide.  Accordingly, the Supreme Court was distinguishing between money damages that could be paid immediately, and money damages that could not be paid until other, nonmonetary relief had been awarded.  <u>Accord</u> <u>Todd v. United States</u>, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[A]ppellants are not seeking presently due money damages, but instead seek the equitable remedy of a reclassification of [a] facility and a salary increase based on that reclassification."); <u>Nat'l Air Traffic Controllers Ass'n v. United States</u>, 160 F.3d 714, 716 (Fed. Cir. 1998) (per curiam) ("Although the Tucker Act has been amended to permit the Court of Federal Claims to grant equitable relief ancillary to claims for monetary relief over which it has jurisdiction, there is no provision giving the Court of Federal Claims jurisdiction to grant equitable relief when it is unrelated to a claim for monetary relief pending before the court.  It is not enough that the court's decision may affect the disposition of a monetary claim pending elsewhere, or that the court's decision will ultimately enable the plaintiff to receive money from the government." (citations omitted)); <u>Overall Roofing & Constr. Inc. v. United States</u>, 929 F.2d 687, 689 (Fed. Cir. 1991) (noting that historically, a "claim" in the Court of Federal Claims is a request for presently due money damages rather than a request for a declaratory judgment), <u>superseded on other grounds by statute</u>, Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 907(b), 106 Stat. 4506, 4519; <u>Wood v. United States</u>, 214 Ct. Cl. 744, 745 (1977) ("[T]he court can only enter judgment for monies presently due and owing from the United States, and, lacking declaratory judgment jurisdiction, cannot adjudicate future rights and obligations."); <u>Johnson v. United States</u>, 105 Fed. Cl. 85, 95-96 (2012) (holding that the plaintiff's claim for the cancellation of his educational debt was not a request for presently due money damages but was instead a request for declaratory relief that was beyond the court's jurisdiction); <u>Annuity Transfers, Ltd. v. United States</u>, 86 Fed. Cl. 173, 179-83 (2009) (holding that the plaintiffs had not alleged a claim for presently due money damages because (1) the contracts at issue provided for the periodic payment of money by the United States; (2) the plaintiffs did not allege that the United States was not making the periodic payments or had otherwise breached the contracts; and (3) the plaintiffs were actually seeking an order allowing for the alteration of the terms of the contracts–declaratory relief–rather than money damages).

The distinction drawn by the Supreme Court in <u>King</u> is not applicable in this case; an insurer's entitlement to unpaid risk corridors payments is not dependent upon the insurer first obtaining a declaratory judgment.  Moreover, taken in isolation, the requirement that money

damages be presently due speaks more to the ripeness of a claim than to whether the court has subject matter jurisdiction to entertain the claim in the first instance. Indeed, it is well settled that once the court determines that a source of law implicated in a plaintiff's complaint mandates the payment of money damages for its violation and that "the plaintiff has made a nonfrivolous assertion that it is within the class of plaintiffs entitled to recover under the money-mandating source," the court must conclude that it possesses subject matter jurisdiction. Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1307 (Fed. Cir. 2008); accord Greenlee Cty., Ariz. v. United States, 487 F.3d 871, 876 (Fed. Cir. 2007); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc portion). Both section 1342 of the Affordable Care Act and the regulation implementing section 1342's payment requirements are money-mandating sources of law. Accord Land of Lincoln, 129 Fed. Cl. at 97. The court therefore has subject matter jurisdiction to entertain plaintiff's claim that the United States violated those provisions.

### C. Plaintiff's Claim for Unpaid Risk Corridors Payments Is Ripe

Although the court possesses jurisdiction over the subject matter of this case, the court cannot exercise that jurisdiction unless plaintiff's claim for unpaid risk corridors payments is ripe for judicial review. To be ripe, a claim must not be contingent upon future events that may or may not occur. Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985). When a claim results from an "administrative determination," the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); accord Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1351 (Fed. Cir. 2015) ("Adherence to ripeness standards prevents courts from making determinations on the merits of a case before all the essential facts are in."). The doctrine derives from both "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993); cf. Shinnecock Indian Nation, 782 F.3d at 1351 n.7 ("Although the Court of Federal Claims is an Article I tribunal, it generally adheres to traditional justiciability standards applicable to courts established under Article III.").

Defendant argues that plaintiff's claim for unpaid risk corridors payments is not ripe because HHS has not determined the total amount of payments due to plaintiff and other insurers under the risk corridors program. This argument is based on the fact that neither section 1342 of the Affordable Care Act nor the regulation implementing section 1342's payment requirements expressly includes a deadline for HHS to make risk corridors payments to insurers. In the absence of an explicit deadline, defendant asserts, HHS may defer payment to insurers until the conclusion of the three-year risk corridors program, or to whenever it has the funds available to make full payment. Accordingly, defendant contends that because HHS is not under any present obligation to make risk corridors payments, will not know the total amount owed to each insurer

until 2017,[6] and does not currently know whether plaintiff will receive the full amount of risk corridors payments it is owed, plaintiff's claim is premature.

The underlying premise of defendant's ripeness argument is that, contrary to plaintiff's contention, plaintiff and other insurers are not entitled to receive risk corridors payments on an annual basis. Specifically, defendant contends that in the absence of an explicit deadline in section 1342 of the Affordable Care Act or the regulation implementing section 1342's payment requirements, HHS possesses the discretion to establish a payment framework; that the two appropriations laws enacted by Congress confirm HHS's discretion; and that the framework adopted by HHS is therefore entitled to deference. Plaintiff responds that the plain language of section 1342 and the Affordable Care Act in general require annual risk corridors payments, that legislative history reveals congressional intent to require annual risk corridors payments, that HHS's failure to make annual risk corridors payments undermines the purpose of the risk corridors program, that HHS's payment framework is not entitled to deference, and that HHS currently owes plaintiff and other insurers risk corridors payments for 2014 and 2015.

### 1. Congress Intended That HHS Make Annual Risk Corridors Payments to Eligible Qualified Health Plans

As suggested by the parties' contentions, the court first turns to the language of the Affordable Care Act to determine whether Congress intended HHS to make annual risk corridors payments. See Lamie v. United States Trustee, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text."); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). In addition to evaluating the specific provision of the Affordable Care Act establishing the risk corridors program, the court must read that provision in the context of the entire statutory scheme of the Affordable Care Act. See King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) (following "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)); Crandon v. United States, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); Kokoszka v. Belford, 417 U.S. 642, 650 (1974) ("When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or

---

[6] Of course, because plaintiff did not participate on an exchange in 2016, HHS would know the total amount of risk corridors payments due to plaintiff for 2014 and 2015 in 2016. Indeed, during the pendency of this suit, HHS published a memorandum indicating that plaintiff was entitled to a risk corridors payment for 2015 of $13,000,493.30. HHS had previously determined that plaintiff was entitled to a risk corridors payment for 2014 of $7,884,886.15. Thus, according to HHS, the total amount owed to plaintiff under the risk corridors program is $20,885,379.45.

statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature . . . .'"  (quoting Brown v. Duchesne, 60 U.S. 183, 194 (1856))); see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); Kilpatrick v. Principi, 327 F.3d 1375, 1384 (Fed. Cir. 2003) ("[I]n determining whether Congress has directly spoken to the point at issue, a court should attempt to discern congressional intent either from the plain language of the statute or, if necessary, by resort to the applicable tools of statutory construction[.]"); Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) ("If . . . the statute's text does not explicitly address the precise question, we do not at that point simply defer to the agency.  Our search for Congress's intent must be more thorough than that.").  If congressional intent regarding the timing of risk corridors payments can be ascertained from evaluating the text of the Affordable Care Act, then the court's inquiry on this issue is complete.  See Conn. Nat'l Bank, 503 U.S. at 254.

### a.  HHS Must Calculate Separate Risk Corridors Payments for Each of the Three Years of the Program

Section 1342 of the Affordable Care Act does not explicitly provide a deadline for HHS to make risk corridors payments to insurers.  However, as plaintiff notes, Congress contemplated that HHS would calculate risk corridors payments separately for each year of the program.  For example, Congress directed HHS to "establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016," 42 U.S.C. § 18062(a), rather than a program for calendar years 2014 through 2016.  In addition, Congress required HHS to calculate "[p]ayments in" and "[p]ayments out" for each year of the program.  See id. § 18062(b)(1), (b)(2), (c)(1), (c)(2).  Although the fact that Congress required HHS to make separate calculations for each calendar year does not necessarily mean that Congress intended for HHS to make annual payments, it does lend credence to such a construction.

### b.  HHS Is Required to Base the Risk Corridors Program on a Preexisting Program in Which It Makes Annual Payments to Eligible Insurers

Plaintiff contends that further support for construing section 1342 of the Affordable Care Act to contain an annual payment requirement is Congress's directive that the risk corridors program "be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w-101 et seq.]."  Id. § 18062(a).  In the statute creating the latter program, Congress directed HHS to establish a risk corridor for each prescription drug plan for each plan year.  Id. § 1395w-115(e)(3)(A).  The regulations implementing the program, which were issued in 2005, provided:

> (c)  Payment methods.  CMS makes payments after a coverage year after obtaining all of the cost data information in paragraph (c)(1) of this section

necessary to determine the amount of payment.  CMS will not make payments under this section if the Part D sponsor fails to provide the cost data information in paragraph (c)(1) of this section.

    (1) <u>Submission of cost data</u>.  Within 6 months of the end of a coverage year, the Part D sponsor must provide the information that CMS requires.

    (2) <u>Lump sum and adjusted monthly payments</u>.  CMS at its discretion makes either lump-sum payments or adjusts monthly payments <u>in the following payment year</u> based on the relationship of the plan's adjusted allowable risk corridor costs to the predetermined risk corridor thresholds in the coverage year, as determined under this section.

42 C.F.R. § 423.336(c) (2009) (final emphasis added).  Thus, in the program upon which the Affordable Care Act's risk corridors program was to be based, HHS–through CMS–would make payments in the year following the coverage year so long as it had received the necessary cost data.  Indeed, for the first year of the program–2006–HHS paid funds owed to eligible plan sponsors in November and December 2007.  <u>See</u> Office of Inspector Gen., Dep't of Health & Human Servs., <u>Medicare Part D Reconciliation Payments for 2006-2007</u> 14 (2009), https://oig. hhs.gov/oei/reports/oei-02-08-00460.pdf ("CMS paid most of the funds owed to sponsors for 2006 by increasing these sponsors' monthly prospective payments for November and December 2007.").  Congress would have been aware of HHS's regulation and payment scheme when it enacted the Affordable Care Act in March 2010.  <u>See</u> <u>Goodyear Atomic Corp. v. Miller</u>, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."); <u>cf.</u> <u>Lorillard v. Pons</u>, 434 U.S. 575, 581 (1978) ("[W]here . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").  To be sure, Congress merely dictated that the Affordable Care Act's risk corridors program "be based on" the program described in 42 U.S.C. § 1395w-115(e); it did not require HHS to establish an identical program under the Affordable Care Act.  Thus, taken alone, the reference to the earlier risk corridors program is not evidence of congressional intent to require annual risk corridors payments under the Affordable Care Act.  At a minimum, however, the reference reflects Congress's approval of a risk corridors program that provides for annual payments.

### c. The Purpose of, and Interplay Among, the Three Premium Stabilization Programs Suggest That Risk Corridors Payments Should Be Made Annually

    Additional evidence of congressional intent is discernable from an examination of the purpose of, and interplay among, the three premium stabilization programs described in the Affordable Care Act.  The transitional reinsurance program was designed to reimburse insurers that covered high-risk individuals during the three-year period beginning January 1, 2014.  42 U.S.C. § 18061(b)(1).  For any plan year that began in the three-year period, insurers were

required to fund reinsurance entities, id., which are "not-for-profit organization[s]" tasked with "help[ing] stabilize premiums for coverage in the individual market in a State during the first 3 years of operation of an Exchange for such markets within the State when the risk of adverse selection related to new rating rules and market changes is greatest," id. § 18061(c)(1). Then, insurers who covered high-risk individuals would receive payments from the reinsurance entities for any plan year that began during the three-year period. Id.

Under the permanent risk adjustment program, each state determines the average actuarial risk for all designated enrollees in that state and then (1) assesses charges on the insurers whose enrollees have less actuarial risk than average and (2) provides payments to the insurers whose enrollees have more actuarial risk than average. Id. § 18063(a). In short, the program compensates insurers who enroll a disproportionate number of higher-risk individuals and penalizes insurers who enroll fewer than average higher-risk individuals. Id. To effectuate the program, states are required to make the calculations, assess the charges, and provide the payments on an annual basis. Id.

The risk corridors program is a temporary, three-year "payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums." Id. § 18062(a). A plan's allowable costs are the total costs to provide the benefits covered by the plan "reduced by any risk adjustment and reinsurance payments received" by the plan, id. § 18062(c)(1), and a plan's aggregate premiums are the "total premiums . . . reduced by the administrative costs of the plan," id. § 18062(c)(2). Insurers with plans in which aggregate premiums exceed allowable costs by a certain threshold remit payments to HHS, and insurers with plans in which allowable costs exceed aggregate premiums by a certain threshold receive payments from HHS. Id. § 18062(b). Such a scheme both protects insurers who underestimate allowable costs and, as a result, charge inadequate premiums, and penalizes insurers who overestimate their costs and, as a result, charge excessive premiums. Id. Consequently, insurers have an incentive to adjust their premiums and costs to avoid paying a penalty to HHS and to ensure, once the risk corridors program concludes, that premiums will cover costs. Indeed, given the temporary nature of the risk corridors program, it is apparent that insurers are expected, by the end of three years, to be capable of more accurately estimating their allowable costs and setting their premiums.

The common thread among the three premium stabilization programs is a concern that insurers' costs would detrimentally exceed the premiums collected. In creating the transitional reinsurance program, Congress recognized that certain insurers might attract more than expected high-risk individuals during the first three years of insurance market reforms, increasing their costs beyond what they anticipated. Similarly, Congress created the permanent risk adjustment program to account for the fact that plans that enroll a disproportionate number of high-risk individuals would incur greater costs. And Congress created the temporary risk corridors program to provide relief to insurers who, in the first three years of insurance market reforms, underestimated their allowable costs and accordingly set their premiums too low. If these programs did not provide for prompt compensation to insurers upon the calculation of amounts

due, insurers might lack the resources to continue offering plans on the exchanges.[7]  Further, if enough insurers left the exchanges, one of the goals of the Affordable Care Act–the creation of "effective health insurance markets," id. § 18091(2)(I)-(J)–would be unattainable.  It is thus nonsensical to suggest that Congress, in enacting provisions meant to ensure the success of the Affordable Care Act, drafted those provisions to cause the opposite effect.  See King, 135 S. Ct. at 2496 ("Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them."); see also N.Y. State Dep't of Soc. Servs. v. Dublino, 413 U.S. 405, 419-20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").  Indeed, Congress did not do so.  Reinsurance and risk adjustment payments are to be made on an annual basis.  And, the risk corridors payment that HHS owes an eligible insurer for a particular year depends upon the amount of reinsurance and risk adjustment payments that insurer received for that same year.  It seems probable, therefore, that Congress intended for risk corridors payments, like the reinsurance and risk corridors payments upon which they depend, to be paid annually.

### d.  Summary

None of the factors described above (the requirement of separate calculations for each year, the reference to a preexisting program in which annual payments are made, the purpose of the premium stabilization programs, and the interplay among the premium stabilization programs), taken individually, conclusively establishes congressional intent.  However, when the factors are considered together, congressional intent becomes apparent:  HHS is required to make annual risk corridors payments to eligible qualified health plans.  Because HHS has ascertained plaintiff's entitlement to risk corridors payments for 2014 and 2015–the only years for which plaintiff asserts its claim–plaintiff's claim for unpaid risk corridors payments is ripe for adjudication.

### 2.  Even if the Affordable Care Act Is Construed as Ambiguous, HHS Interprets the Act as Requiring Annual Risk Corridors Payments to Eligible Qualified Health Plans

The court's conclusion that plaintiff's claim is ripe would be no different had it determined that the Affordable Care Act was ambiguous as to whether HHS was required to make annual risk corridors payments.

As previously noted, Congress directed HHS to "establish and administer" the Affordable Care Act's risk corridors program.  42 U.S.C. § 18062(a).  Thus, HHS and CMS published several proposed and final rules setting forth how they intended to administer the program.  The regulations adopted in the final rules do not specify a deadline for HHS to make risk corridors payments.  However, in the first proposed rule, issued on July 15, 2011, HHS indicated that it was considering such a deadline:

---

[7]  Alternatively, an insurer whose costs greatly exceeded its premiums might, in the face of uncompensated losses, opt to discontinue offering plans on the exchanges even if it possessed sufficient resources to sustain those losses and remain on the exchanges.

> For example, a QHP issuer required to make a risk corridor payment may be required to remit charges within 30 days of receiving notice from HHS.  Similarly, HHS would make payments to QHP issuers that are owed risk corridor amounts from HHS within a 30-day period after HHS determines that a payment should be made to the QHP issuer.  We believe that QHP issuers who are owed these amounts will want prompt payment, and also believe that the payment deadlines should be the same for HHS and QHP issuers.

76 Fed. Reg. at 41,943.  Such deadlines would help effectuate the goal of the risk corridors program–"to provide QHP issuers with greater payment stability as insurance market reforms are implemented" and "protect against uncertainty in setting rates in the Exchange by limiting the extent of issuer losses (and gains)."  Id. at 41,931; accord 77 Fed. Reg. at 73,119.

In addition to these proposed and final rules, CMS published a memorandum to explain how HHS would make and fund the risk corridors payments.  In this memorandum, dated April 11, 2014, CMS indicates that it would use risk corridors payments it receives from insurers required to pay into the program to make risk corridors payments to insurers entitled to payment from the program, and

> if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall.  Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.  If, after obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall.  If any risk corridors funds remain after prior and current year payment obligations have been met, they will be held to offset potential insufficiencies in risk corridors collections in the next year.

Def.'s App. 2 at 54.

"When a court reviews an agency's construction of the statute which it administers" and determines that "Congress has not directly addressed the precise question at issue, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 842-43 (footnote omitted).  Further, if an agency's regulations do not directly address the question at issue, the court "must necessarily look to the administrative construction of the regulation . . . , which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14 (1945); accord Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own

regulations."); see also Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005) ("Deference to an agency's interpretation of its own regulations is broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own.").

There can be no dispute that the regulations promulgated by HHS to establish the risk corridors program are based on a permissible construction of section 1342 of the Affordable Care Act–neither the Act nor the regulations contain an explicit deadline for HHS to make risk corridors payments. Thus, the court turns to HHS's construction of its own regulations.

Two documents–the July 11, 2011 proposed rule and the April 11, 2014 memorandum–reflect that HHS construed its regulations to require annual risk corridors payments. In the July 11, 2011 proposed rule, HHS stated that the purpose of the risk corridors program was to assist insurers during the implementation of the insurance market reforms required by the Affordable Care Act. In furtherance of this purpose, HHS stated that it was considering setting identical deadlines for insurers to remit payment to HHS and for HHS to make payments to insurers–thirty days after determining the amounts due–because it believed that insurers would want prompt payment and that the payment deadlines for HHS and insurers should be the same. In other words, HHS recognized that to be effective, the risk corridors program should provide for regular payments, both to and from insurers, throughout the existence of the program. See also 78 Fed. Reg. at 15,531 (adopting regulations requiring insurers to submit risk corridors information annually (by July 31 of the year following each benefit year) and then remit payment to HHS within thirty days of being notified of the amount due). Additionally, in the April 11, 2014 memorandum, CMS represented that HHS intended to make whatever payments it could after each of the three years of the risk corridors program. In other words, HHS intended to make annual risk corridors payments with the funds it had available. Indeed, HHS has, in actual practice, has made annual risk corridors payments to insurers. Moreover, there is no evidence that HHS understood that it could choose not to make annual risk corridors payments to insurers. Thus, there can be no dispute that HHS construes its regulations to require annual risk corridors payments.

Because HHS determined that plaintiff is entitled to a $7,884,886.15 risk corridors payment for 2014 and a $13,000,493.30 risk corridors payment for 2015, the only remaining issue is whether plaintiff was entitled to full payment for 2014 in December 2015 and full payment for 2015 in December 2016. This issue is not abstract or hypothetical, and its resolution does not rest upon contingent future events (such as HHS's determination concerning whether it will be able to fully compensate insurers entitled to risk corridors payments). Accord Land of Lincoln, 129 Fed. Cl. at 101 ("The possibility of the government's making some or all of the risk-corridors payments in the future does not change this calculus. . . . HHS allegedly breached its statutory and regulatory obligations by failing to make full payments annually. Subsequent HHS payments might bear on [the plaintiff]'s ability to receive amounts due, but they will not affect [the plaintiff]'s underlying claim."); see also Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 81-82 (1978) (remarking that waiting for a regulation-triggering event to

occur "would not . . . significantly advance [the court's] ability to deal with the legal issues presented nor aid [the court] in their resolution"). Rather, resolution of this issue will require the court to determine, on the merits, whether HHS is permitted to make partial annual risk corridors payments under section 1342 of the Affordable Care Act and its implementing regulations. Accordingly, even had the court concluded that section 1342 of the Affordable Care Act was ambiguous with respect to the timing of risk corridors payments, plaintiff's claim for unpaid risk corridors payments for 2014 and 2015 would be ripe for adjudication.

### D.  The Court Lacks Jurisdiction to Provide Some of the Relief Requested by Plaintiff

Defendant raises one final issue in its motion to dismiss:  whether the Court of Federal Claims possesses subject matter jurisdiction to entertain plaintiff's requests for relief aside from the unpaid risk corridors payments.  Specifically, defendant argues that the court lacks subject matter jurisdiction to award, as plaintiff requests, consequential, special, or other damages resulting from defendant's failure to make full risk corridors payments; declaratory and injunctive relief; and prejudgment and postjudgment interest.  With respect to its requests for consequential, special, or other damages; equitable relief; and prejudgment interest, plaintiff does not dispute defendant's contention.

Plaintiff's decision not to contest the bulk of defendant's position is sound.  First, the Court of Federal Claims may only award money damages if a money-mandating source of law provides for such an award.  See Loveladies Harbor, Inc., 27 F.3d at 1554; see also Clean Fuel LLC v. United States, 110 Fed. Cl. 415, 418 (2013) ("This court has no jurisdiction over a claim for one type of money damages if the 'money-mandating' statute the plaintiff cites pertains only to a different type of money damages.").  Plaintiff has not identified any source of law entitling it to any type of money damages other than unpaid risk corridors payments.  Accordingly, the court lacks subject matter jurisdiction to entertain plaintiff's request for consequential, special, or other damages.

Second, except in a limited number of statutorily defined circumstances, the Court of Federal Claims cannot entertain claims for nonmonetary equitable relief.  See Bowen v. Massachusetts, 487 U.S. 879, 905 & n.40 (1988); Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec., 490 F.3d 940, 943 (Fed. Cir. 2007); Kanemoto v. Reno, 41 F.3d 641, 645 (Fed. Cir. 1994).  None of those circumstances applies here.  See 28 U.S.C. § 1491(a)(2) (providing the court with jurisdiction to issue, "as incident of and collateral to" an award of money damages, "orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records"); id. (providing the court with jurisdiction to render judgment in nonmonetary disputes arising under the Contract Disputes Act of 1978); id. § 1491(b)(2) (providing the court with jurisdiction to award declaratory and injunctive relief in bid protests); id. § 1507 (providing the court with jurisdiction to issue declaratory judgments under 26 U.S.C. § 7428).  Thus, the court does not possess subject matter jurisdiction to entertain plaintiff's request for declaratory and injunctive relief.

Third, the Court of Federal Claims may not award interest in suits against the United States "in the absence of an express waiver of sovereign immunity from an award of interest." Library of Cong. v. Shaw, 478 U.S. 310, 311 (1986), superseded on other grounds by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, § 114, 105 Stat. 1072, 1079 (codified at 42 U.S.C. § 2000e-16(d)).  Pursuant to 28 U.S.C. § 2516(a), "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof."  Plaintiff does not allege a breach of contract or identify any federal statutes that would entitle it to prejudgment interest.  As a result, the court lacks subject matter jurisdiction to entertain plaintiff's request for prejudgment interest.

Plaintiff does, however, argue that the Court of Federal Claims may, in appropriate circumstances, award postjudgment interest.  In support of this contention, plaintiff relies on 28 U.S.C. § 1961(c)(3), which allows for the payment of interest "on judgments of the United States Court of Federal Claims only as provided in . . . any other provision of law"; 28 U.S.C. § 1961(c)(2), which allows for the payment of interest "on all final judgments against the United States in the United States Court of Appeals for the [F]ederal Circuit"; and 28 U.S.C. § 2516(b), which allows for the payment of interest "on a judgment against the United States affirmed by the Supreme Court after review on petition of the United States . . . ."  The latter two provisions are not applicable in this case; 28 U.S.C. § 1961(c)(2) relates to final judgments of the Federal Circuit and 28 U.S.C. § 2516(b) becomes operative only when the United States unsuccessfully appeals a judgment to the Supreme Court.  See generally Mobil Oil Co. v. United States, 374 F.3d 1123 (Fed. Cir. 2004).  Thus, plaintiff cannot make a nonfrivolous assertion that it is within the class of plaintiffs entitled to recover postjudgment interest under these provisions.  See Jan's Helicopter Serv., 525 F.3d at 1307.  Moreover, plaintiff has not, pursuant to 28 U.S.C. § 1961(c)(3), identified any statute allowing for the payment of interest on judgments of the Court of Federal Claims.  Accordingly, the court lacks subject matter jurisdiction to entertain plaintiff's request for postjudgment interest.

## III.  CONCLUSION

In sum, the court possesses subject matter jurisdiction to entertain plaintiff's claim that HHS, by failing to make full risk corridors payments for 2014 and 2015, violated section 1342 of the Affordable Care Act and the regulation implementing section 1342's payment requirements, but lacks subject matter jurisdiction to entertain plaintiff's requests for consequential, special, or other damages resulting from defendant's failure to make full risk corridors payments; declaratory and injunctive relief; and prejudgment and postjudgment interest.  In addition, plaintiff's claim for unpaid risk corridors payments for 2014 and 2015 is ripe for adjudication.

The court therefore **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss. Defendant shall file an answer in accordance with the RCFC.

      **IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge
